# PIERCE v. STATE:

## (*Jackson.*   April Term, 1914.)

1. **CRIMINAL LAW.** Appeal.   Indictment.   Objection Below.
   Necessity.

   Where defendant went to trial without any objection to the form
   of the indictment and interposed no objection that any evidence
   was incompetent as not tending to prove the offense charged,
   or that he was taken by surprise or in any way misled by lack
   of more specific averments therein, and made no motion in the
   circuit court in arrest of judgment, his objection for the first
   time on appeal came too late.   (*Post, pp.* 28-38.)

   Acts cited and construed:   Acts 1911, ch. 32.

   Constitution cited and construed:   Art. 1, sec. 9.

   Cases cited and approved:   Scruggs v. State, 66 Tenn., 38;  Forrest
   v. State, 81 Tenn., 106;  State v. Rogers, 65 Tenn., 563;  Glidewell
   v. State, 83 Tenn., 135;  Rodes v. State, 78 Tenn., 414;  Luttrell
   v. State, 85 Tenn., 232;  Stevenson v. State, 64 Tenn., 683;  Pal-
   mer v. State, 121 Tenn., 490.

   Code cited and construed:   Sec. 6531 (S).

2. **CRIMINAL LAW.**   Motion in Arrest of Judgment.   Defect in
   Indictment.

   Where the indictment is good on its face a motion in arrest of
   judgment is of no avail; as it does not reach matter appearing
   only in the evidence.   (*Post, pp.* 28-38.)

3. **ARSON.**   Prosecution.   Sufficiency of Evidence.

   Evidence in·a prosecution under Shannon's Code, sec. 6531, for
   willfully and maliciously burning a barn containing valuable
   property therein, *held* to preponderate against the verdict of
   guilty.   (*Post, pp.* 38-42.)

   Code cited and construed:   Secs. 6430-6433 (S.).

4. CRIMINAL LAW.   Parties to Offenses.   "Principal in First Degree."

A "principal in the first degree" is the actual or absolute perpetrator of the crime, and, where a crime is committed in the absence of the offender, by means prepared beforehand, he is a principal in the first degree.   (*Post, pp.* 42-44.)

5. CRIMINAL LAW.   Parties to Offenses.   "Principal in Second Degree."

A "principal in the second degree" is one who is present aiding and abetting the crime, though at common law his presence need not be an actual, immediate, standing by within sight or hearing of the crime, but may exist by reason of a constructive presence, as where one commits a crime and another keeps watch or guard.   (*Post, pp.* 42-44.)

6. CONSPIRACY.   Criminal Liability.

Where two or more persons conspire or combine by concert of action to commit a crime, and it is done by one of them in the absence of the other or others, the crime is the act of all. (*Post, p.* 44.)

Cases cited and approved:   Owen v. State, 84 Tenn., 4; Autry v. Coffman, 46 Tenn., 510; Strady v. State, 45 Tenn., 307; Cornwell v. State, 8 Tenn., 147.

7. CRIMINAL LAW.   Parties to Offenses.   "Accessory Before the Fact."

At common law an "accessory before the fact" is one who, though not the chief actor in the offense nor present at its performance, is in some way concerned therewith before the fact; one who though absent at the time of the offense yet procures, counsels, or commands another to commit it; and this definition, or the distinction between principal and accessory, has not been changed by Shannon's Code, sec. 6430, declaring that one inciting, counseling, or procuring another to commit a felony is an accessory before the fact, section 6431, permitting accessories before the fact to be punished as principals except when otherwise expressly provided, or section 6432, permitting the

Pierce v. State.

conviction of an accessory whether the principal has been previously convicted or not; and hence a case against an accessory before the fact cannot be sustained where the person charged as the principal offender is acquitted. (*Post, pp.* 44-47.)

Code cited and construed: Secs. 6431, 6432.

Cases cited and approved: State v. Ayers, 67 Tenn., 99; Moody v. State, 46 Tenn., 300; Edge v. State, 117 Tenn. 405; Nuthill v. State, 30 Tenn., 247; State v. Roger, 65 Tenn., 563.

Case cited and distinguished. Self v. State, 65 Tenn., 244.

8. **CONSPIRACY.** Sufficiency of Evidence.

In a prosecution under Shannon's Code, sec. 6531, for willfully and maliciously burning a barn containing valuable property, evidence *held* insufficient to show that defendant conspired with a third person to compel the alleged principal to burn the barn, but to show that such third person acted of his own motion. (*Post, pp.* 44-47.)

---

FROM OBION.

---

Appeal from Circuit Court, Obion County.—JOSEPH E. JONES, Judge.

PIERCE & FRY, for appellant.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. JUSTICE BUCHANAN delivered the opinion of the Court.

Pierce was jointly indicted with Sherman Adair at the January term, 1913, of the court above named. The indictment charged that:

They did "on the —— day of November, 1912, in the county aforesaid, unlawfully, feloniously, willfully, and maliciously set fire to the valuable barn of Caleb Cherry, which contained valuable property therein, with the unlawful, willful, and felonious intent to burn said barn and contents. Said barn and contents was the property of Caleb Cherry and was worth several dollars, good and lawful money and currency of the United States," etc.

Neither of the parties so charged moved for a severance, but each of them interposed his separate plea of not guilty; and they were jointly tried in the county aforesaid during the month of May, 1913, upon which trial the verdict of the jury was:

"That they find the defendant Sherman Adair not guilty, and find defendant Oliver Pierce guilty and assess his punishment at two years in the State penitentiary."

Pierce made a motion for a new trial which was overruled, and from the action of the court thereon, and its further action in adjudging that he serve a term of two years in the penitentiary, he has appealed to this court and assigned error.

We now proceed to dispose of the questions he makes. One of them is that the court erred in refusing his application for a continuance. The record fails to show such an abuse of discretion by the trial judge in this matter as to constitute reversible error, especially in view of chapter 32, Acts of 1911.

Another question made is that Pierce was indicted as a principal but was tried upon evidence which, if true, shows that he was only guilty as an accessory before the fact, and it is therefore urged that the indictment was no such notice to him of the nature and cause of the accusation against him as he was entitled to under article 1, sec. 9, of the Constitution of the State. The record, however, fails to disclose any objection to the form of the indictment. Pierce went to trial upon it without any objection as to its form, nor did he, during the introduction of evidence, interpose the objection that the evidence was incompetent as not tending to prove the offense with which he was charged, or that he was taken by surprise, or in any way misled by lack of more specific averment in the indictment. He made no motion in the circuit court in arrest of judgment. His objection to the indictment now comes too late. *Scruggs* v. *State,* 7 Baxt. (66 Tenn.), 38. Where the indictment is good on its face, a motion in arrest of judgment is of no avail. That motion does not reach matter appearing only in the evidence. *Forrest* v. *State,* 13 Lea (81 Tenn.), 106; *State* v. *Rogers,* 6 Baxt. (65 Tenn.), 563. On the point that the objection here made comes too late, see, also, *Glidewell* v. *State,* 15 Lea (83 Tenn.), 135; *Rodes* v. *State,* 10 Lea (78 Tenn.), 414; *Luttrell* v. *State,* 85 Tenn., 232, 1 S. W., 886, 4 Am. St. Rep., 760; *Stevenson* v. *State,* 5 Baxt. (64 Tenn.), 683; *Palmer* v. *State,* 121 Tenn., 490, 118 S. W., 1022.

Another insistence is that the evidence preponderates against the verdict of the jury. Manifestly, the

indictment was framed under section 6531 of Shan. Code, which denounces every person who shall willfully and maliciously burn or set fire to any house, barn, stable, or other valuable building containing valuable property therein, etc., and fixes the punishment of such offender at not less than two nor more than twenty-one years. The following facts are undisputed on this record. Fire was set to Caleb Cherry's barn on the night of November 11, 1912. Practically no damage was done to the barn, as the fire was extinguished soon after it was set. The setting of the fire was clearly of incendiary origin. Those who extinguished the fire, or were present shortly thereafter, noticed a decided odor of coal oil at the place where the fire had been, and at this place there was found a broken bottle containing a small quantity of coal oil. The setting of this fire was inspired by the willful and malicious purpose denounced by the statute. It was the hand of Sherman Adair which set the fire. At the time the fire was set, Oliver Pierce was not at the place where that act was done, but was some two and a half or three miles away from that spot, and was spending the night at the home of his brother-in-law, one Willis Codey.

Pierce stoutly denied on his trial, and as he testifies at all times theretofore, any participation in or guilty knowledge of the crime, and there is in the record undisputed evidence of his previous good character. Although subjected to a rigid cross-examination, the cred-

ibility of his evidence was unshaken, so far we may judge from the transcript before us.

Beside Sherman Adair, the transcript discloses only one man beyond dispute who knew of the purpose of Adair to set fire to the barn on the night in question. That man was Willis Codey, brother-in-law of plaintiff in error, and at whose house plaintiff in error was spending the night of November 11, 1912. The story related by Codey, who testified as a witness on behalf of the state, was in substance that plaintiff in error at the time in question lived about three or four hundred yards from Caleb Cherry, and that, about sundown on the evening in question, Pierce, accompanied by his wife and two children, and also by Adair, came to the home of Codey intending to spend the night; that, some time after their arrival, Pierce told Codey that Adair was going to burn Caleb Cherry's barn that night, and Pierce wanted to get four dollars from Codey to pay Adair for burning the barn; that Codey gave Pierce the four dollars on receipt of a check for that amount, drawn by Pierce on the Mason Hall Bank; that on the following day Pierce told Codey that the money had been given by him to Adair. After the check incident, and after supper on the night in question, Codey testifies that he had some business which called him to go to the home of a Mr. Freeman, who lived a few hundred yards from the home of Caleb Cherry, the same being two and a half or three miles from the home of Codey; that he (Codey) and Adair rode away from his home on the horse of Oliver Pierce;

that Pierce was in the house when Codey and Adair left; that Adair carried with him a quart bottle of coal oil which he (Adair) took out of the buggy of Oliver Pierce; that, on the way from his home and going toward that of Cherry and Freeman, Codey and Adair rode through a wood lot for about a mile of the distance. Codey testified that they rode through this wood lot looking for his mare, but failed to find her. It crops out later in his evidence that it was a dark night. Codey testified that, while on the way toward the home of Cherry, Adair told him that he intended to burn Cherry's barn and wanted to ride that far with Codey. We now quote from Codey's evidence as follows:

"I was going to Mr. Freeman's after the log wagon. I didn't think, of course, that he was going to do it and I rode on with him until I got nearly there, and he still said he was going to burn the barn. Then I told him that I was going back home, and he got off the horse a couple of hundred yards from Mr. Cherry's, and I turned around and started back, and he went on and set the barn afire and come back through the field and overtaken me something like a quarter of a mile from Mr. Cherry's.

"Q. Then what?

"He told me that he set it afire, and I told him I couldn't see any light and I didn't believe he had. He said he did, and then we went on back home. After I got back home I drawed a bucket of water, and Pierce got up and come out there and asked me if he had

burned it, and I told him I didn't know, but that he said he did.''

There is more of Codey's evidence, but what has been said suffices for our purpose.

We now quote from the evidence of Adair as follows:

''Now, Mr. Adair, go ahead and tell the jury in your own words in detail all you know about the transaction, the burning of the barn of Mr. Cherry; go ahead and tell it in your own way.

''A.  Willis—Oliver carried a bottle of coal oil.

''Oliver who?

''A.  Pierce—over to Willis Codey's in his buggy he carried it over there, got it at his house.

''When was that?

''A. Monday evening.

''Who went with him?

''A.  Had me and his wife.

''Did you ride in the buggy with them, or did you walk?

''A.  Rid in the buggy with him.

''Go ahead and tell.

''A.  That night Willis and Oliver told me, after we eat supper, to go out in the yard to draw a bucket of water, and Oliver asked Willis was he going to burn that barn, and he says he didn't know whether he would or not, guessed he would.  Willis caught the horse, and they made me get on it behind him, and went on through the pasture, and I says: 'Willis, I don't want to burn that old man's barn. I ain't got a thing in the

world against him. I don't want to do him any harm,
I don't even know him.' Well, that was in the lane.
There was a lane going along there, and he said: 'Yes,
God damn you! You have got to burn it.. If you don't,
I will shoot your heart out.' He says, 'You are off
down here and nobody don't know you and you have
got to burn it,' and he had a gun, it looked like it was
that long (indicating), and drawed it on me, and said,
'God damn you, if you don't burn it, I will shoot your
heart out.'

"By the Court: That was Willis talking to you?

"A. Yes, he had his gun, he was in the road, and·
I was at the barn, and I poured the coal oil on it so
it wouldn't burn much, and he says, 'You strike a
match, I want to see you strike a match to it,' and when
I struck the match he whirled around and told me to
meet him at the black gum tree.

"At the time you went over to Pierce's, or rather
with Pierce over to Codey's house, did you know
what he was going there for?

"A. Oliver?

"Yes.

"A. He was going over there to see about some
logs.

"Did you go over there to get a job?

"A. No, Willis Codey cut some logs to build a barn,.
and Oliver was going over there, and I went with him.

"After you got over there, did the defendant Oliver
Pierce tell you why he brought his wife along?

"A.   Yes, he said he brought his wife over there to stay with Willis' wife so that if anything come up they would have all that to prove out of it that he wasn't about there, that none of us was about the house, if anything ever come up about the barn; that is the words he said to me.

"What time in the evening was it you got over to Willis Codey's house, you and Pierce?

"A.   I don't remember exactly what time; it was late though."

It will be observed that the witnesses Codey and Adair are irreconcilably in conflict in their evidence. Analysis of the evidence of each of these men discloses a degree of moral turpitude which reduces the probative value of the evidence of each of them to the minimum.   No other witness in the transcript save Codey and Adair testifies to any knowledge of a guilty connection on the part of Pierce with the burning of the barn.   Pierce gives a reasonable account, as we think, of his presence at the home of Codey on the night in question.   It will be remembered that the two men were brothers-in-law, and the evidence of Pierce shows that on Sunday night preceding the fire Codey and his wife spent the night at the home of Pierce; that on Monday Codey was engaged in hauling logs near the home of Pierce; that a day or two before that time Adair had come to the home of Pierce seeking work. Adair had formerly lived in Gibson county, and had there been employed by the father-in-law of Pierce; that both Codey and Pierce knew Adair.   Pierce, how-

ever, had no work for Adair to do, but Codey said he would give Adair work if Pierce would take Adair over to Codey's house. Whereupon it was arranged that Pierce and his family would come on a visit to Codey's home, and Adair would accompany them there for the purpose of getting work with Codey.

It is therefore apparent that the verdict of the jury must rest alone upon the evidence of Codey and Adair, and such corroboration thereof as we will now refer to. There was exhibited with the evidence of Codey the check for four dollars dated November 11, 1912, drawn upon the Mason Hall Bank and signed by Oliver Pierce; but Pierce denies that this check, though dated the same day as the fire, had any connection with that fact, and explains that the check was written at his own home on the morning of the day in question, and his explanation of the transaction is as follows:

"The check that has been introduced by the state drawn by you payable to Willis Codey, will you explain to the jury what that check was drawn for and how it came to be drawn?

"A. It was in settlement of a mare that I bought from him, and give him one hundred and thirty dollars for the mare. I paid him seventy-seven dollars one time, thirty-three dollars at another time, sold him logs for ten dollars, I sold him six dollars worth of lumber, and give him a check for four dollars in settlement of the balance.

"Are there some figures on the back of that check?

"A. Yes, sir.

"Explain to the jury just what those figures are.

"A. The lumber he bought from me.

"Well, explain about it.

"A. He wanted about forty pieces twelve foot long of stuff and two sills with twelve and three-fourths feet in it, would make a little over five hundred feet, or something about that."

The State called W. A. Midyett, Chas. Montgomery, and T. O. Morris, and sought by each of these witnesses to prove certain statements made by the father of the witness Codey at the preliminary trial of this case. The elder Codey died between the dates of the two trials, and, by each of the witnesses named, the State on the later trial endeavored to show that the elder Codey, under oath before the committing court, had testified to a conversation between himself and Oliver Pierce, in which the latter practically confessed his guilt; but no one of the three men wrote down the evidence of the elder Codey on the committing trial, and no one of these witnesses agrees in his evidence with either of the other two witnesses as to what the evidence of the elder Cody was on the committing trial. Oliver Pierce and his brother (the latter being present when the conversation was had between Oliver and the elder Codey) deny that Oliver made any confession of guilt, but say that he only told the elder Codey that Clyde Ball had interviewed Adair in jail, and that Adair told Ball that Willis Codey and Oliver Pierce were connected with the crime. In considerating the weight of the evidence of the elder Codey before the

committing trial, whatever that evidence may have been, the fact must not be overlooked that he realized the peril in which his son Willis was placed by the confession of Adair. This is shown by the evidence of the brother of Oliver Pierce, who heard the conversation, and who states that during the conversation Mr. Codey said:

"Willis has been knocking at the penitentiary for ten years, and now the door is open; he has reached it."

The State introduced Irving Ring, aged nineteen years, who testified that, in the spring or summer at a time when he was working for Willis Codey and living at his house, Oliver Pierce came there, and while the three, Pierce, Codey, and Ring, were sitting on the front porch, Pierce offered to Ring, in the presence and in the hearing of Codey, twenty-five dollars to burn Caleb Cherry's barn; that he (Ring) declined, and there the conversation ended. He testified that he never spoke to any man about this fact until the morning of the trial in the circuit court, when he related it to one of the attorneys employed for the State. It is therefore manifest that he did not testify at the committing trial, though it is clear that Willis Codey knew of the importance of the evidence of this witness prior to the time of the committing trial, if the evidence of the witness Ring was true.

Oliver Pierce denies its truth. The State next introduced Maj. Winsett, who tells of an offer made to him by Pierce four years before the trial of this cause. The

offer made to the Major seems to have contemplated business on a larger scale, for he says Oliver wanted him to burn two barns, one owned by Oliver, so that Oliver might get the insurance on it; the other he says was the barn of Caleb Cherry. He says Oliver gave no reason why he wanted to burn the barn of Caleb Cherry. There was evidence by some two or three witnesses for the defense, who were, however, connected by blood or marriage with Oliver Pierce, that the Major had admitted before he went on the stand and during the term at which the trial took place that he had been paid twenty-five dollars to testify as above. It is rather curious to note that neither Ring nor Winsett appeared to have felt or expressed any indignation when, as each of them says, Pierce made the offer to which each of them testifies. For aught that appears in the evidence of either of these witnesses, the offer seems to have been regarded as quite an ordinary incident.

Whether we view the evidence of Codey and Adair as that of accomplices or not, the moral turpitude of each of them so clearly appears that a conviction based on such evidence should only be allowed to stand where that evidence and the corroboration of it is of sufficient strength to support the verdict. It is manifest that the jury disregarded the evidence of Codey and gave credit to that of Adair; the verdict demonstrates this fact. The verdict must have been based upon credit which the jury gave to the evidence of Adair that he fired the barn under the well-founded fear that, if he refused to obey the command of Codey, the latter

would then and there inflict upon him death or great bodily harm. It is equally manifest that, if the jury had believed the evidence of Codey, they would have convicted both Adair and Pierce. It is also clear that the jury did not believe, as Codey testified, that Adair was moved to fire the barn by the bribe of four dollars offered by Pierce.

In the light of the evidence, the verdict of the jury can only mean that it believed the firing of the barn to have been the result of the will, the presence, and the command of Codey. Believing this, it is clear that the jury could not have believed that the firing of the barn resulted from any influence brought to bear by Pierce upon Adair. The decided weight and preponderance of the evidence, considered as a whole, tended to support the theory that Willis Codey was the moving spirit in this crime. Pierce testified that he had no knowledge of the time when and the purpose for which Codey and Adair left the house of Codey on the night in question. Pierce denied all knowledge of or connection with the bottle of coal oil carried by Codey and Adair from the home of Codey to the barn, and he denied each and every other incriminating circumstance to which either Adair or Codey testified. Codey, on the contrary, admits that he carried Adair to a point within two hundred yards of the barn. He tries to hide under the thin cover of his statement that he did not believe that Adair would burn the barn, and he endeavors to make it appear that when within two hundred yards of the barn he turned about and started

home.  But he admits that, while he was on horse-back and Adair was on foot, the latter overtook him, and the two returned to Codey's home in company. For a reason which Codey does not attempt to explain, he seems to have given up entirely the visit to the home of Mr. Freeman, which he professed to have left his own home that night for the purpose of making. Codey's evidence as a whole is unreasonable, contradictory, and highly self-incriminating.  He professes to have had no ill will toward Caleb Cherry, and yet testifies to no act nor word of his own looking to the prevention of a crime which he admits that he knew was threatening Cherry's property.

Slight as was the credibility to which the evidence of Adair was entitled, we are not surprised that the jury gave credit to it over that of Codey.  The evidence of Caleb Cherry shows that in July preceding the trial, which was nearly a year before the fire was set to the barn, there was a quarrel between Cherry and Pierce, in which the latter threatened to take the life of Cherry; but Cherry was asked if Pierce made any threats then about any future trouble, or what he would do in the future, and Cherry answered, "No."  This evidence of ill feeling and the association of Pierce with Codey and Adair at a time so near the occurrence of the fire appears to be the only real corroboration which this record affords of the incriminating evidence of Codey and Adair against Pierce.

Upon the whole case, however, we believe the evidence preponderates against the verdict of the jury.

There is another view of the evidence which is in substance, that there is in this transcript really no evidence that Oliver Pierce was guilty of the crime with which he was charged in the indictment, and of which the jury by its verdict found him guilty.    He was charged as a principal in the commission of the crime. The jury by its verdict found him guilty as a principal with no evidence before it of his guilt as a principal offender.    In other words, under the evidence, the highest degree of crime of which he could have been convicted was that degree known to the common law and to our statutes as accessory before the fact.    Our statute defining the above degree of crime is as follows:

"Any person who shall feloniously move, incite, counsel, hire, command or procure any other person to commit a felony, is an accessory before the fact."    Shan. Code, section 6430.

We also have the following statutes relating to this degree of crime:

"All accessories before the fact shall be punished as the principals are punished, except when otherwise expressly provided."    Shan. Code, section 6431.

"An accessory before the fact may be prosecuted and convicted for a substantive felony, whether the principal felon has or has not been previously convicted the offense being cognizable in any court having jurisdiction of the crime of the principle felon."    Shan. Code, Section 6432.

"No person once tried, either as accessory before the fact with his principal, of for a substantive offense, under the foregoing section, shall be again indicted and tried for the same offense." Shan. Code, section 6433.

At common law, the different degrees of guilt among persons capable of offending were principal and accessory, and the degree of principal was by law subdivided. There was a principal in the first degree; he was the actor or absolute perpetrator of the crime. And there was a principal in the second degree; he was one who was present, aiding and abetting the fact to be done, the crime. The presence of the principal in the second degree needed not at common law to be an actual immediate standing by within sight or hearing of the fact; but that degree might exist by reason of a constructive presence, as where one commits a robbery or murder and another keeps watch or guard at some convenient distance. The rule requiring actual presence at the fact was not without its exceptions, for, in case of murder by poisoning, one might be a principal felon by preparing and laying the poison or persuading another to drink it who was ignorant of its poisonous quality, or by so arranging that one would take poison in the absence of the actor. Illustrations further along this line are of murder committed in the absence of the murderer by means which he had prepared beforehand, as by laying a trap or pitfall, or letting out a wild beast, or inciting a madman, so that death in each instance should ensue. In such cases, the actor was at common law held guilty of murder as a principal

in the first degree.    It was said that such an actor in crime could not be called an accessory, as that necessarily presupposed a principal, and that, in the cases above given, the poison, the pitfall, the beast, or the madman could not be held principals; they being, on the contrary, only instruments of death.    It was further said that, as the actor in crime must be guilty either as principal or accessory, and as he could not in the cases above but be guilty as accessory, it followed that he must be guilty as principal, and, if guilty as principal, then he must be guilty in the first degree; there being no other criminal, much less a superior in guilt, whom he could aid, abet, or assist.    Blackstone, vol. 2, book 4, c. 3, p. 34.

The same author says:

"An accessory is he who is not the chief actor in the offense, nor present at its performance, but in some way concerned therein either before or after the fact committed."

And at page 36 he says of an accessory before the fact:

"Sir Matthew Hale defines him to be one who, being absent at the time of the crime committed, doth yet procure, counsel, or command another to commit the crime.    Herein absence is necessary to make him an accessory: for if such procurer, or the like, be present, he is guilty of the crime as principal."

Again:

"And it is also settled that whoever procureth a felony to be committed, though it be by the intervention

of a third person, is an accessory before the fact. It is likewise a rule that he who in any wise commands or counsels another to commit an unlawful act is accessory to all that ensues upon that unlawful act; but is not accessory to any act distinct from the other. But if the felony committed be the same in substance with that which is commanded, and only, varying in some circumstantial matters, as if, upon the command to poison Titius, he is stabbed or shot, and dies, the commander is still accessory to the murder, for the substance of the thing commanded was the death of Titius, and the manner of its execution was a mere collateral circumstance.''

An exception to the rule that a principal in the first degree must be present at the fact of the crime exists where two or more persons conspire or combine by concert of action to commit a crime, and it is done by one of them in the absence of the other or others. Here the crime is the act of all who so conspired. *Owen* v. *State,* 16 Lea (84 Tenn.), 4; *Autry* v. *Coffman,* 6 Cold, (46 Tenn.), 510; *Strady* v. *State,* 5 Cold, (45 Tenn.), 307; *Cornwell* v. *State,* Mart. & Y. (8 Tenn.), 147.

No substantial difference exists between our statutory definition of a person guilty as accessory before the fact and the above given by Mr. Blackstone and Sir Matthew Hale, and the distinction between persons guilty as principals and those guilty as accessories before the fact, in so far as the difference in degree of guilt is concerned, exists under our jurisprudence today as it did at common law before our legislation on

Pierce v. State.

the subject.   Some changes have been wrought by our legislation, but these changes have not obliterated the above distinction.   Illustrations of the above statement are to be found in sections 6431 and 6432 of Shan. Code.   It is a mistake to suppose that either of the sections last above named destroys the distinction existing at common law between the degree of guilt of a principal and an accessory in crime.   Our cases clearly recognize this distinction.   *State* v. *Ayers,* 8 Baxt. (67 Tenn.), 99; *Moody* v. *State,* 6 Cold. (46 Tenn.), 300; *Self* v. *State,* 6 Baxt. (65 Tenn.), 244; *State* v. *Roger,* 6 Baxt. (65 Tenn.), 563; *Edge* v. *State,* 117 Tenn. 405, 99 S. W., 1098, 10 Ann. Cas., 876.

While it is true that, under section 6431, Shannon's Code, accessories before the fact are to be punished as principals, except when otherwise expressly provided, and while it is true that, under section 6432, an accessory before the fact may be prosecuted and convicted for a substantive felony whether the principal felon has been previously convicted or not, yet it is also true, under our jurisprudence as it was at common law, that the state's case against an accessory before the fact can only be made out by proof of facts which show the accused to have been guilty of feloniously moving, inciting, counseling, hiring, commanding, or procuring some other person to commit the felony, and by the further proof of the commission of the felony by the person upon whom the accused person so wrought or moved.   *Self* v. *State,* 6 Baxt. (65 Tenn.), 244; *Nuthill* v. *State,* 11 Humph. (30 Tenn.); 247.

In *Self* v. *State,* supra, it was said that the first thing which devolved upon the prosecution was to prove the guilt of the principal offender, and that the making of this proof was a necessary prerequisite to the conviction of the defendant in that case as an accessory before the fact; and further on in that opinion it is said that the trial of an accessory before the fact involves a double trial, meaning that, in such trial, there must first be ascertained the guilt of the principal in the crime in question, and next there must be ascertained the guilt of the accessory before the fact. If we should concede that the evidence in the present case was relevant to the issue made by the indictment, and the defendant's plea of not guilty, the conviction in this case could not be sustained for the reason that the principal offender was acquitted of the charge. Therefore one element of the guilt of an accessory before the fact is lacking. Pierce cannot be held on the ground that he moved or incited Adair to commit the crime, because the jury has said that Adair was not guilty, nor can Pierce be held to have moved or incited Codey to commit the crime, because the proof shows that Codey did not set fire to the barn. Nor can Pierce be held to have conspired with Codey to compel Adair to fire the barn, because we think the evidence preponderates against that conclusion, and tends to show that Codey acted of his own motion.

Upon each of the views of the case which we have considered, we are of opinion that the verdict of the jury is against the preponderance of the evidence, and

Pierce v. Stae.

it results from the views which we have expressed that the case must be reversed and remanded, with the recommendation that a *nolle prosequi* be entered in the court below.