Douglas Cavert *v.* The State.

(*Nashville.* December Term, 1928.)

Opinion filed, March 18, 1929.

ZACH CARNEY, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Douglas Cavert, referred to herein as the defendant, has appealed from a judgment sentencing him to the penitentiary for twenty-one years for first degree murder. He was jointly indicted with his wife, Cremelle Cavert, for killing Charles Cassaway. At the time of the homicide the defendant was twenty years of age.

By the second count in the indictment the defendant was charged with being an accessory before the fact, in that he moved, incited, procured and commanded his said wife to murder Charles Cassaway.

Upon the first trial the defendant and his wife were jointly convicted of first degree murder, and the defendant was acquitted as an accessory before the fact.

The trial court granted the defendant a new trial, but declined to give his wife a new trial. She thereupon appealed to this court, where the case was reversed and remanded for a new trial.

A brief statement as to the relationship of these parties would be proper at this time.

Some years before the date of the homicide J. L. Cassaway, father of deceased, married the mother of the defendant. This was his fifth matrimonial venture. The defendant thereafter made his home with his stepfather.

In October, 1924, the defendant married his codefendant and carried her to the Cassaway home. At that time Charles Cassaway and his wife were likewise members of that home.

In November, 1924, Charles Cassaway and his wife moved to a farm near Hall's Mill, which is located on Duck River, some two and a half miles from the Cassaway home.

On the first trial Mrs. Cavert testified that while Charles Cassaway was living with his father he attempted

534

to assault her upon one or more occasions; that her husband and Charles had a quarrel about the matter, and indicated that this was the reason for Charles moving.

Mrs. Cavert further testified that on the afternoon of March 31, 1925, as she came down the road on a horse, Charles Cassaway stopped her horse and undertook to drag her therefrom for the purpose of criminally assaulting her, when she drew a pistol, fired and killed him.

After this homicide J. L. Cassaway and his wife separated and a little later Mrs. Cassaway filed a divorce bill against her husband. Both became bitter partisans in the homicide case.

Sometime after the first trial the defendant and his wife separated and she became hostile to her husband and his mother and friendly with the Cassaways.

After her case was reversed by this court, she went to the office of the District Attorney General, accompanied by J. L. Cassaway and her counsel, and executed a written statement to the effect that her testimony on the former trial was altogether false, and that her husband procured her to kill the deceased, which she did through fear. She further stated that she did not know why the defendant wanted Charles killed, but testified on the second trial that the defendant and his mother thought they could get J. L. Cassaway's property if Charles were out of the way.

Mrs. J. L. Cassaway is shown to be a woman of excellent character, and this feature of Mrs. Cavert's testimony is unreasonable, improbable and contrary to the weight of the testimony.

Another motive relied upon by the State is that the defendant wanted Charles out of the way for fear he would disclose to the grand jury the fact that he was

manufacturing whisky. It appears that Charles had been subpoenaed to appear before the circuit court on April 15th, but for what purpose does not appear.

Mrs. Cavert further testified upon the second trial that her husband was engaged in operating a still across Duck River from their home, but no other witness was produced to corroborate her as to this.

After this written confession was executed, it appears that a severance was ordered and the defendant was placed on trial, with the result stated.

At the time of the homicide the defendant was either seated in Hall's Mill, or on the porch in front of the mill, talking to Mr. Parsons.

Parsons, whose character is well sustained, testified that he and the defendant were in the mill when the shooting took place.

The defendant testified to the same effect.

Two women testified that Parsons told them that he and the defendant were sitting on the porch, but the evidence shows that the day was a cold one and people were staying on the inside with doors closed. This, however, is not a matter of any great importance.

The mill was 167 yards from the place where Mrs. Cavert shot Cassaway. There is no proof that the defendant witnessed the shooting, or that he was armed, or that he had agreed to take any part therein, or that he was in a position to aid or assist his wife in the commission of the crime. The only evidence introduced upon this matter was to the contrary. We quote from Mrs. Cavert's statement as to what took place between her and the defendant, shortly before the killing, to-wit:

"I got up and went to the kitchen, and when I got out there he said: 'Will you do this today,' and of course, I

said: 'I would not,' and seemed like that when I said that he just went crazy, and he cursed me and threw things, and finally got me by the throat and the left hand, wrist, and he twisted my wrist until it felt like it would come in two; and he made me put on my clothes, and he told me where Charlie was. He was plowing in the field, and he said: 'Now this evening you get on the roan mare and you go down there and you kill that dam skunk,' and I begged and begged for him to have some sense, and I asked him time and again what he had against Charlie, and he would never tell me, would just say that he hated the ground that the dam skunk walked on, that was his very words. I tried every way in the world to reason with him, but it seemed like the more I said the worse he got. Oh Yes! and he would say that he would do it hisself, but if he did, they would put him in an electric chair. He didn't care where they put me, and when I refused and told him that I would die first, he said: 'Well you can prepare to die then,' and he told me that if I didn't go that afternoon and shoot Charlie, that the very bullets that was meant for him, would go to me. After he left, or before he left, he told me that I need not try to get home, he said: 'I will watch every move you make, and I will see that you do it this time, because it is the last chance you have got.' "

The Attorney General, in taking Mrs. Cavert's statement, asked her the following question:

"Q. Well have you been led to believe Mrs. Cavert, that if you should go to the Attorney General and the Sheriff and make a statement that you would not be prosecuted, or prosecution would not be as severe?

"A. Well, Yes."

The defendant testified in his own behalf and contradicted the testimony of his wife upon all material matters. A number of. witnesses testified to his good character while a like number testified to the contrary.

With this preliminary statement we will proceed to dispose of the various questions raised by the assignments of error.

First, does the evidence preponderate against the verdict?

If we accept the testimony of Mrs. Cavert, the State has made out a clear case of accessory before the fact. But the defendant has been acquitted of that offense.

(1) To meet this situation, the State makes two contentions. First, that there was a conspiracy between the defendant and his wife to kill the deceased, in which event the defendant, although absent, is accountable for the act of his wife, citing *Pierce* v. *State,* 130 Tenn., 44.

In 5 R. C. L., 1060, it is said:

"It has been said that the crime of conspiracy was well known to the common law, depending upon clear principles and having characteristics and ingredients which separated it from all other crimes. This is undoubtedly true, but it is doubtful whether a satisfactory definition of this crime has yet been made. Chief Justice SHAW complained that he found, after examining the decided cases, great difficulty in framing any definition or description which specifically identified the offense— a description broad enough to include all cases punishable under it, without including acts which are not punishable. He was of the opinion that as a general description, though perhaps not a precise and accurate definition, a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some crimi-

nal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. This definition, or rather description, has been widely accepted, and although authorities have been able to specify certain combinations or even certain classes of combinations which the term conspiracy, as understood in law, connotes, it is doubtful if the definition has been improved upon.''

The evidence in this case negatives the idea that there was to be any concerted action by these parties in taking the life of Cassaway. The wife alone was to commit the act.

If procuring and commanding his wife to commit the crime constituted a conspiracy, then conspiracy and accessory before the fact mean the same thing, and the defendant has been acquitted of that offense.

*(2)* There is a distinction, however. One contemplates joint action in the commission of the crime, the other does not.

If A and B agree to kill C the first time they meet him, that would be a conspiracy.

If A employs B to kill C and he does so in A's absence, A would be an accessory before the fact.

*(3)* The State contends, in the second place, that the defendant was properly convicted as an aider and abettor under section 6429 of Shannon's Code, which is in this language:

''All persons present, aiding and abetting, or ready and consenting to aid and abet, in any criminal offense, shall be deemed principal offenders, and punished as such.''

It is well settled that where, by statute, the distinction between principals in the first and second degree is abol-

ished, an indictment of a principal in the second degree need not aver any facts further than those requisite to an indictment of the principal in the first degree. 31 C. J., 738, 740; 1 R. C. L., 143, 184; *McGowan* v. *State,* 17 Tenn., 194; *Workman* v. *State,* 36 Tenn., 428; *Moody* v. *State,* 46 Tenn., 306; *Luper* v. *State,* 73 Tenn., 263; *Taylor* v. *State,* 79 Tenn., 716.

(4) According to the testimony of Mrs. Cavert, who was introduced by the State, she alone was to kill the deceased and the defendant was not to aid her. In fact, he did not do so, was not prepared to do so, and was not in such proximity to the scene of the killing as to take part therein.

The rule is thus stated in 1 R. C. L., 139:

"The person charged as a principal in the second degree must be present aiding and abetting the crime or in such contiguity as to enable him actually to render aid. But while the law requires the presence of the aider or abettor, in order to render him a principal, it does not require a strict, actual, immediate presence, such a presence as would make him an eye or ear witness of what occurs, for if the abettor, at the time of the commission of the crime, were assenting to it, and in a situation where he might render some aid to the perpetrator, ready to give it if necessary, according to an appointment or agreement with him for that purpose, he would, in the judgment of the law, be present and aiding in the commission of the crime. It must therefore be proved that the abettor was in a situation in which he might render his assistance, in some manner, to the commission of the offense. It must be proved that he was in such a situation, by agreement with the perpetrator of the crime, or with his previous knowledge consenting to the crime, and

for the purpose of rendering aid and encouragement in the commission of it. It must also be proved that he was actually aiding and abetting the perpetrator at the time of the crime. But if the abettor were consenting to the crime, and in a situation in which he might render any aid by arrangement with the perpetrator, for the purpose of aiding and assisting him in the crime, then it would follow as a necessary legal inference that he was actually aiding and abetting at the commission of the crime. For the presence of the abettor under such circumstances must encourage and embolden the perpetrator to do the deed, by giving hopes of immediate assistance; and this would in law be considered as actually aiding and abetting him, although no further assistance should be given. For it is clear, that if a person is present aiding and consenting to a felony, that alone is sufficient to charge him as a principal in the crime. And the presence by construction or judgment of the law is in this respect equivalent to actual presence. The question to be determined in ascertaining whether a person is in a position to aid and abet in the commission of an offense, is not so much where he may happen to be, as whether he is in a position to render aid and encouragement to the actual perpetrator, with a view of insuring the success of the common purpose."

In *Moody* v. *State,* 46 Tenn., 305, it was said:

"To make an abettor to a murder or homicide, principal in the felony, two things are requisite: *first,* he must be present; *second,* he must be aiding and abetting in the felony.

"As to the first proposition: If several persons come to commit a felony or make an affray, and are of the same party, and come into the same house, but are in

several rooms of the same house, and one be killed in one of the rooms, those of the party that come for that purpose, though in the other rooms of the same house, shall be said to be present: 1 Hale's Pleas of the Crown, 439. 'The like in cases of burglary; though some stood at the end of the lane to watch if any come to disturb them; yet they are said to be burglars, because they are aiding and assisting in the burglary.'

" 'Second, Who shall be said to be aiding and abetting? The rule is, if divers persons come with the intent to do mischief, as to kill, rob or beat, and one doeth it, all are principals in the felony. Again, if a party go upon an unlawful purpose, and one of the company kill one of the adverse party, in pursuance of that design, all are guilty.' "

Applying these principles of law to the facts of this case, we are unable to say that the defendant was so near to the crime as to enable him actually to render aid; or that he was at the mill for that purpose. So far as his whereabouts was concerned, he might have just as well been five miles away. His wife had not seen him since he left home three or four hours prior to the killing, and there is no evidence that he had been seen that day by the deceased. In our opinion, accepting the testimony of Mrs. Cavert as true, a clear case of accessory before the fact is made out. If her testimony is rejected, the State has not made out a case of first degree murder against the defendant.

If the judgment of the trial court should be affirmed, concededly it would have to be predicated upon the testimony of a self confessed perjurer, who admits that, in reversing her former testimony, she was induced to believe that her own punishment would be lessened.

*(5)* Unquestionably, the testimony of Mrs. Cavert, against her husband, was incompetent, because it related to matters that grew out of the marital relation, or to transactions between herself and husband, or to information acquired by her as a result of the marital relation.

The policy of the State is expressed in section 5596 of Shannon's Code, with respect to civil actions, in this language: ". . . neither husband or wife shall testify as to any matter that occurred between them by virtue or in consequence of the marital relation."

In *Insurance Co.* v. *Shoemaker*, 95 Tenn., 82, this court said:

"We are of opinion that all transactions and conversations had between the husband and wife in relation to their own affairs, not in the presence of some third person, fall within the prohibition of the statute."

This rule is applied, perhaps, with more strictness in criminal cases.

In *Norman* v. *State*, 127 Tenn., 340, the court said:

"No public policy is sound which, in the name of public justice, invades the home and takes therefrom the wife as a witness against the husband or the husband against the wife, and by means of the evidence of one, consigns the other to the gallows, the penitentiary, or the jail. An increased number of convictions might result from such a policy, but at a cost which the public could ill afford. The home is the sanctuary of our civilization, and the increased number of convictions would not compensate for the homes destroyed."

In *McCormick* v. *State*, 135 Tenn., 218, it was said:

"The matter that the law prohibits either the husband or wife from testifying to as witnesses includes any information obtained by either during the marriage and

by reason of its existence. It should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known.''

In this last named case it was held that the rule was not effected by chapter 161, Acts of 1915.

*(6)* In that case it was also held that where an exception was once made to this character of testimony, because privileged, it was unnecessary to repeat the exception when the same character of testimony was subsequently offered.

In the case under consideration, at the conclusion of Mrs. Cavert's testimony, counsel for the defendant moved to exclude all of her testimony ''because she was the wife of defendant.''

''The court called attention to the statute, saying, as he recalled it, it was expressly provided that 'husband or wife might be witness for or against the other,' and overruled the motion, and defendant, by counsel, excepted.

''Later, and before the next witness testified, the court called defendant's counsel's attention to this matter and said some of the evidence might be incompetent, but much of it was competent, and he would act on exception to any part of the evidence which counsel would point out.''

The court, on two later occasions, made the same suggestion to counsel, to which counsel replied: ''I am relying on my motion and exception.''

While most of the material testimony offered by Mrs. Cavert, especially that part which undertook to fasten responsibility upon the defendant for the crime, was incompetent, other portions of her testimony was com-

petent; and a general exception to all of her testimony "because she was the wife of the defendant" would hardly be sufficient.

When Mrs. Cavert began her testimony to the effect that her husband procured her to kill the deceased, counsel should have formally objected thereto, upon the ground that the relationship of husband and wife existed between the witness and the defendant, and that the matters, about which she proposed to testify, were privileged. Counsel could have added that, without making formal exception to each question asked, he wished to be understood as excepting to the testimony of this witness as to all matters growing out of the marital relation, and as to all information acquired by the witness as a result of the marital relation. Out of a superabundance of precaution, counsel frequently renew their motion to exclude when the testimony is concluded. The purpose of the rule is to require counsel to bring to the attention of the court the character of testimony excepted to and the grounds upon which the exception is based.

(7) Counsel for the State insist that counsel for the defendant made the testimony of Mrs. Cavert competent by making her written confession (in substance the same as her testimony on the second trial) an exhibit to her testimony.

The court, however, held that this confession could not be received as substantive evidence but could only be considered in determining the credibility of the witness.

As previously stated, even though Mrs. Cavert's testimony be admitted, the record makes out a case of accessory before the fact. If her testimony be excluded, the evidence is not sufficient to sustain a conviction for murder.

Since the case will have to be reversed, for the reasons stated herein, it becomes unnecessary to comment further upon the facts.

Reversed and remanded.