Charles William **BURTON**, Plaintiff-in-Error,

v.

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.

Aug. 7, 1973.

Certiorari Denied by Supreme Court Nov. 5, 1973.

Hugh Stanton, Sr., Memphis, for plaintiff in error.

David M. Pack, Atty. Gen., Weldon B. White, Jr., Asst. Atty. Gen., Nashville, Don A. Dino, Asst. Dist. Atty. Gen., Memphis, for defendant in error.

## OPINION

OLIVER, Judge.

Indigent and represented below and here by the duly-appointed public defender, Burton has perfected an appeal in the nature of a writ of error to this Court contesting his Shelby County Criminal Court armed robbery conviction for which he was sentenced to imprisonment for 15 years in the penitentiary.

■ Since the defendant challenges the sufficiency of the evidence and insists that it preponderates against the verdict of the jury and in favor of his innocence, we summarize it briefly. About 6:30 p. m. December 18, 1971, after the store's door was locked, Raymond Dowty, manager of Jay's Drive-In Grocery Store, put in a money sack the cash register contents totaling $700 and placed the sack and his .38 pistol on the counter. A tall Negro man, wearing a red Afro wig, a dark sweat shirt and burgundy pants and armed with a large knife, entered the store by kicking the locked door open and tearing off the latch, and told Dowty "I want to talk with you." The man then knocked off Dowty's glasses, taped his hands and eyes and forced him to lie on the floor. When the store's cashier, Mrs. Juanita Hall, began crying and screaming and begging him not to hurt them, the intruder ordered her to the rear of the store. He then fled with the money sack and the pistol, leaving his knife and a roll of tape on the meat counter. Dowty testified in court that the defendant looked like the robber, and also that after viewing a police line-up he had said that the defendant looked like the man who robbed the store but he could not identify him as the one. Mrs. Hall positively identified the defendant as the robber. Both she and Dowty testified that prior to the robbery the defendant had been in the store, and she testified that he came into the store two weeks after the robbery and she believed at that time he was the robber.

Mildred Houston testified that in October 1971 the defendant and his wife came to live with her; that the defendant's wife left two weeks later but the defendant stayed there until January 13, 1972; that when she changed the linen in the defendant's room she noticed a knife similar to the one used in the robbery; and that Jay's Drive-In Grocery Store was about two blocks from her home.

Mrs. Houston's son Leotis testified that on the evening of December 18, the defendant left the house and upon returning about an hour later told him that the store behind the house had been robbed; that he saw the two men who robbed the store run past his car, and that the robbers used a hunting knife; that later after receiving a telephone call, the defendant told him that his girl friend said that the car used in the robbery was like his own black and red supersport; that he told the defendant he had better be careful or the police would arrest him; that after the defendant parked his car behind the house he saw in it a roll of gray air-conditioning tape like that used in the robbery; and that at the time of the robbery the defendant was unemployed but thereafter had money.

The defendant's wife, Irene, testified that on the day of the robbery they were

not living together but were seeing each other; that around 7:00 o'clock one night the defendant took her home, and from inside the house she watched him through the window in the door and saw him take a red Afro wig out of the trunk of his car, which was parked on the street, and put it on; that as he took it off she opened the door and asked him what he had on and he said, "Nothing" and threw the wig into the back seat of the car; and that she did not know what month this occurred. Apart from the jury, she had testified that this was a few days before the robbery.

Memphis Policeman Marshall testified that when he arrested the defendant in February of 1972 and advised him concerning his constitutional rights, the defendant denied robbing the store and said he did not know where it was located and had never been there, and that on the day of the robbery he was working in Mississippi.

As the only defense witness, the defendant denied robbing the store. He maintained that he did not know where it was located and had never been there; that he had never before seen Dowty or Mrs. Hall; that he never told Leotis Houston he had seen the store robbers run past his car; and that he never owned a red wig and never put one on. He testified that the knife and tape used in the robbery were not his; that he had a similar knife but sold it before the robbery; that he had black tape in his car which he used to patch the holes in the car seat; that he read about the robbery in the paper and said something about it to Houston at that time; that after the robbery he had money because he earned around $200 every two weeks and had received $150 deposit from a furniture company when his credit was not approved; that at the time of the robbery he was working at the Underwood Glass Company, located on the Tennessee-Mississippi State line; and that at the time of his arrest, he thought he had worked there on the day of the robbery but later remembered that he did not.

Considering the material evidence in the light of the oft-repeated rules governing appellate review when the sufficiency of the evidence is challenged, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S. W.2d 799; Hancock v. State, 1 Tenn.Cr. App. 116, 430 S.W.2d 892; Morelock v. Sate, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr. App. 609, 455 S.W.2d 637, we can only conclude that the jury was well warranted in finding the defendant guilty. He has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

Equally groundless is the contention advanced by the defendant's final two Assignments, the substance of which is that it was prejudicial error to admit the testimony of his wife concerning the red wig she saw him place on his head prior to the robbery, on the ground that her testimony was inadmissible under the privileged communication rule applicable to matters occurring between spouses and to information and knowledge obtained by virtue of and in consequence of the marital relation.

TCA § 24–103 provides, in pertinent part:

"In all civil actions, . . . all persons, including husband and wife, shall be competent witnesses, though neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation; save in action for divorce brought by either spouse, when the parties or either of them shall be at liberty to testify to all matters occurring between them by virtue of the marital relation."

TCA § 40–2404 provides:

"In all criminal cases, the husband or the wife shall be a competent witness to testify for or against each other."

The foregoing statutory provisions have been interpreted and construed many times by our Supreme Court.

In McCormick v. State, 135 Tenn. 218, 186 S.W. 95 (1916), the Supreme Court of Tennessee held that TCA § 40–2404, supra, [originally enacted as Chapter 161 of the Acts of 1915] did not abrogate the rule expressed in TCA § 24–103, supra, that one spouse is not permitted to testify against the other, over objection, as to any matters occurring between them by virtue of or in consequence of the marital relation, or as to any confidential communications between them. In that case the defendant was convicted of begetting an illegitimate child upon his wife's sister. His wife was permitted to testify, over defense objections, about what her husband had told her concerning his associations with this sister. The Court expressly refrained from discussing the Assignments directed to the weight and sufficiency of the evidence. Reversing the conviction and remanding the case for a new trial, the Court said:

"In the case of Insurance Co. v. Shoemaker, 95 Tenn. 72, 82, 31 S.W. 270, Mr. Justice Wilkes concisely stated the rule in this state, in civil cases, as follows:

'We are of opinion that *all* transactions and conversations had between the husband and wife in relation to their own affairs, not in the presence of some third person . . . must be excluded. . . . This, we think, is in accord with the former holdings of this court'—citing Patton v. Wilson, 2 Lea 101, 113; Orr v. Cox, 3 Lea 621; Hyden v. Hyden, 6 Baxt. 408; Brewer v. Ferguson, 11 Humph. 565; Kimbrough v. Mitchell, 1 Head 540; and Barker v. McAuley, 4 Heisk. 424 (Emphasis by Court).

"The case of Norman v. State, 127 Tenn. 355, 155 S.W. 135, 45 L.R.A.,N.S., 399, is one in which a very able opinion was delivered by Mr. Justice Buchanan, wherein he said:

'No public policy is sound which, in the name of public justice, invades the home and takes therefrom the wife as a witness against the husband, or the husband against the wife, and by means of the evidence of one consigns the other to the gallows, the penitentiary, or the jail. An increased number of convictions might result from such a policy, but at a cost which the public could ill afford. The home is the sanctuary of our civilization, and the increased number of convictions would not compensate for the homes destroyed.'

"The foregoing decisions were rendered before the passage of Acts of 1915, chapter 161 [TCA § 40–2404]. This act does not have the provision of chapter 200 of the Acts of 1879 (Shannon's Code, §§ 5596 and 5597) [TCA § 24–103], that neither of them 'shall testify as to any matter that occurred between them by virtue or in consequence of the marital relation.'

"So we must decide whether or not, since the passage of said act of 1915 [TCA § 40–2404], a husband or wife will be permitted, over objection, to testify in criminal cases in this state, as to any matter that occurred between them by virtue or in consequence of the marital relation, or as to any confidential communications between them.

" 'All communications between husband and wife are presumed confidential and privileged until the contrary appears.' Wigmore, Ev., § 2336, pp. 3260, 3264.

\*　\*　\*　\*　\*　\*

". . . We are therefore of the opinion that, while chapter 161 of the Acts of 1915 [TCA § 40–2404] made a husband or wife a competent witness to testify for or against each other in all criminal cases, it did not abrogate the rule as to privileged or confidential communications. Sound public policy requires that neither the husband nor the wife shall be

permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation. The sacredness of the home and the peace of families can only be preserved and protected by enforcing this long-established rule of the common law."

In Cavert v. State, 158 Tenn. 531, 14 S. W.2d 735, a husband and wife were jointly, indicted and tried and convicted of first degree murder. He was granted a new trial by the trial court, and on appeal the Supreme Court reversed her conviction and remanded her case for a new trial. In the husband's second trial, following a severance, the wife testified as a prosecution witness that he coerced her to kill the deceased and threatened her life if she did not do so. She also testified that her husband, the defendant, was operating a moonshine still near their home. The defendant testified in his own behalf and contradicted his wife's testimony upon all material matters. The Court reversed and remanded, holding that the wife's testimony was unquestionably incompetent because it related to matters that grew out of the marital relation, or to transactions between herself and her husband, or to information acquired by her as a result of the marital relation.

In Hanvy v. State, 215 Tenn. 322, 385 S.W.2d 752 the defendant was convicted of forgery and passing a forged check for $42.80. A grocery store clerk positively identified the defendant as the one who endorsed the name of a fictitious payee on the back of the check, which was written on one of several blank checks previously stolen from a construction company. Nor was there any person connected with the construction company by the name of the one who purportedly signed the check for the company as drawer. The defendant did not testify but introduced his mother and his wife who testified in support of an alibi.

His wife was asked on cross-examination by the State, and replied negatively, if she had not admitted to a named probation officer that she helped spend $1000 in stolen money about 10 years earlier, knowing it to be stolen. The State then called the probation officer in rebuttal and he testified that the defendant's wife made that statement to him. According to the opinion, this referred to money allegedly stolen by the defendant during their marriage.

In that case the Court again expressly stated it was unnecessary to pass upon the Assignments of Error challenging the sufficiency of the evidence to warrant and support the verdict, because violation of the privilege of confidential communications between husband and wife required reversal and remand, citing McCormick v. State and Cavert v. State, supra. The Court said: "We think the asking of the question under such circumstances is clearly reversible error for the reason that it sought indirectly to elicit from the wife some confidential information that the question implies came to her through the marital relation with the defendant."

■ All marital communications are, by implication, confidential, and a contrary intention must be made to appear by the circumstances of any given case. Hazlett v. Bryant, 192 Tenn. 251, 241 S.W.2d 121.

In Dowdy v. State, 194 Tenn. 212, 250 S.W.2d 78, a prosecution of a husband for unlawfully carrying a pistol, the Court held that testimony by his wife that he had beat her and chased her out of their house into a city street and had followed her with a pistol in his hand threatening to shoot her, did not relate to a confidential transaction and was not inadmissible as a privileged communication. The Court said:

" 'To be privileged, the subject of the communication must be one that would not have been disclosed except for the marital relation, as privilege extends only to confidential communications, and does not cover topics incident to general intercourse or facts which come to the knowledge of the testifying spouse by means equally accessible to persons

standing in the marital relation.' Wharton's Criminal Evidence § 1250.

" 'As a general rule, to make a communication between husband and wife privileged, it must be confidential in its nature, or at least not obviously of a different character. Wherever a communication, because of its nature or the circumstances under which it was made, is obviously not intended to be confidential, it is not privileged.' 58 Am.Jur., Witnesses, § 380.

" 'The essence of the privilege is to protect confidences only. This is inevitably required by the very nature of this class of privileges (ante, § 2285). The purpose is to insure subjectively the free and unrestrained privacy of communication, divested of any apprehension of compulsory disclosure; and if the communication is not intended to be a private one, the privilege has no application to it.' Wigmore on Evidence, Third Edition, § 2336."

In 3 Wharton's Criminal Evidence (12th Edition, Anderson) § 826, it is said:

"To be privileged, the communication must be confidential or, as sometimes stated, one which would not have been made but for the marital relationship, such as communications with respect to private family matters and troubles.

\* \* \* \* \* \*

"Whenever a communication, because of its nature of the circumstances under which it was made, was obviously not intended as a confidential communication, no privilege exists. No privilege arose when a husband left his wife a note written on a large cardboard put in a conspicuous place.

"The privilege does not extend to conversations with third parties which the wife overheard, as in the case of business transactions between one of the spouses and a third person.

\* \* \* \* \* \*

"When there is no communication, as in the case of a diary of one spouse, kept secret from the other, no privilege exists."

In Section 827 of the same text it is said:

"No privilege extends to acts which the wife observes without the husband's knowledge, since there was no confidence reposed by him under such circumstances."

In the present case, the defendant and his wife were separated. He returned her to her mother's home. She went into the house and closed the door. Through the door's window she saw the defendant take the wig from the car, which was parked on the street, and place it on his head. Those facts which she observed were equally observable by any member of the public who happened to be in a position to see the defendant at that time. He was not even aware of her surveillance until she emerged from the house and asked him what he was doing. In our judgment there can be no doubt that under those circumstances the rule of privileged communications between spouses was inapplicable. Her testimony as to his acts which she observed without his knowledge was admissible, because no confidence was reposed by him under the circumstances.

Affirmed.

WALKER, P. J., and DWYER, J., concur.