**STATE of Tennessee, Appellee,**

v.

**Danny BRANAM, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

May 24, 1993.

James H. Varner, Jr., Leslie M. Jeffress, Randall E. Reagan, James J. Montague, Jr., Knoxville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Nashville, Rebecca L. Gundt, Asst.

Atty. Gen., Robert L. Jolley, Jr., Mike G. Nassios, Asst. Dist. Attys. Gen., Knoxville, for appellee.

## OPINION

DAUGHTREY, Justice.

In this direct appeal, we are asked to reverse defendant Danny Branam's convictions on charges of conspiracy to commit armed robbery, armed robbery, and first degree murder, and to set aside the death penalty he received for the murder conviction. At this stage, the case presents three principal issues for review: (1) whether a confession obtained surreptitiously from Branam by means of a "jail-plant" should have been suppressed as a violation of either federal or state law; (2) whether the state withheld evidence that was material to the defendant's guilt or innocence, or to his punishment, in violation of *Brady v. Maryland;* and (3) whether Branam, as a participant in a felony-murder, is subject to imposition of the death penalty.

Because we conclude that Branam was improperly sentenced to death under both state and federal law, we find it necessary to reduce his sentence to life imprisonment. Because the record suggests but does not clearly show that there was a *Brady* violation, we conclude that the case must be remanded for a hearing on this issue. Although the trial court's resolution of the *Brady* question may require a retrial, we find no reversible error in connection with the introduction of the defendant's confession and hold that it would be admissible at a second trial, if one becomes necessary.

Our rulings on these three questions make moot many of the other issues raised on appeal, including several alleged improprieties in the voir dire of the jury on matters related to capital punishment and various challenges to the constitutionality of Tennessee's death penalty statute. As to the remaining questions, we find no grounds for reversal of Branam's conviction.

## I. *Pretrial Issues*

◼ With regard to the trial court's alleged error in severing Branam's trial from those of his two co-defendants, the record on appeal is inadequate for review. Although the motion itself is included in the technical record, there is no transcript of the hearing on the motion, nor any other evidence indicating why the state sought the severance or why the trial court allowed it. Hence, there is no way to substantiate the defendant's claim that the prosecution moved to sever in order to take unfair advantage of him at trial. Moreover, the severance issue was not included in the defendant's motion for a new trial and has therefore been waived as a ground for relief on direct appeal.

On the issue of the trial court's failure to permit appointed counsel to withdraw, we likewise conclude that the record is inadequate for review. It shows that some two weeks before trial, Branam's attorneys filed a motion in the trial court to withdraw as counsel. Two days later, at a hearing on the motion, one of the two trial attorneys appointed to represent the defendant made the following statement to the trial judge:

> We have had a situation arise, Judge, in which we have been placed in the position of having a conflict in this cause. The actual nature of that conflict, I am unable to divulge, because of the attorney-client privilege. I can tell the Court that it is one which places me in conflict and Mr. Montague in conflict with the disciplinary rules and our obligations to our client.

Because the problem involved the confidences of his client, counsel was never any more specific about the "conflict." He indicated that other lawyers, lacking "the long and involved contact with this case" that he and his co-counsel had, would not have the same difficulties and urged the court to appoint new counsel. At the end of the hearing, the trial judge suggested that counsel seek an opinion from the disciplinary board "right away" and "presently denied" the motion. There is no further information in the record concerning the motion to withdraw. Attorneys representing Branam on appeal surmise that his trial

attorneys were concerned about possible fraud that the defendant might "attempt to foist upon the trial court should he testify at trial." Of course, this sort of problem likely would have continued to exist for successor counsel.

■■■ The law provides that a trial judge may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant in a criminal case. *See* T.C.A. § 40–14–205. But the trial court has wide discretion in matters regarding the appointment and relief of counsel, and its action will not be set aside on appeal unless a plain abuse of that discretion is shown. *State v. Rubio*, 746 S.W.2d 732, 737 (Tenn.Crim.App.1987). We find nothing in the present record that would require mandatory withdrawal of counsel or even permit the permissive withdrawal of counsel. *See* Supreme Court Rule 8, DR 2–110; *cf. Jones v. State*, 548 S.W.2d 329, 333–334 (Tenn.Crim.App.1976). Moreover, the record contains only vague allegations of a conflict and does not show an abuse of discretion by the trial court in refusing to allow counsel to withdraw. Finally, the defendant has not established on appeal that there was an actual conflict of interest that adversely affected counsel's performance. *See State v. Street*, 768 S.W.2d 703, 708 (Tenn.Crim.App.1988). For these reasons we find no reversible error in connection with the trial court's ruling on counsel's motion to withdraw.

## II. *Sufficiency of the Evidence*

■■ The proof at trial showed that just after midnight on July 23, 1987, residents of a south Knoxville neighborhood were awakened by the sound of gunshots, followed by the intermittent honking of a car horn. Police were summoned, only to find 60–year–old Gladys Houston, badly wounded and bleeding, in the front seat of her automobile in the driveway of her home. Houston was conscious but unable to talk. She was transported to the University of Tennessee Hospital, where she later died from her wounds.

Gladys Houston had sustained multiple gunshot wounds. The coroner's report indicated that she suffered a contact wound to her left hand, a fatal wound to her right neck extending up through the right side of her nose, a wound to her right shoulder, and an incidental wound to her scalp. Bullet fragments and cartridge casings found at the scene, as well as a fragment taken from her body, established that she had been shot with a nine-millimeter gun. Shots had been fired from behind the automobile through the rear window and from outside the driver's side of the car. When the vehicle was found, the driver's door, the front passenger door, the glove compartment, and the trunk were all open. A small automatic weapon containing one round of ammunition was found on the floorboard of the driver's side of the car. The safety was engaged and the weapon had not been fired.

The Houston family had operated a stockyard in Sweetwater, Tennessee, for many years. The state theorized that the perpetrators thought that Gladys Houston would be carrying the proceeds from the stockyard's weekly sales on the night she was killed. Instead, her husband had deposited those sums, and she had left the stockyard around midnight with only the proceeds from a snack bar, a drink machine, and a "flea market" run by the family. She also had a sack of tomatoes that she had been given. The tomatoes and a bag containing $6.50 in change from the soft drink machine were missing from her car when she was found. Later that morning, a neighbor discovered the sack of tomatoes, a few 25–cent coin wrappers, and a cloth bank bag lying along the road approximately 600 yards from the Houston home.

Several witnesses remembered seeing a Cadillac in the vicinity of the stockyard the night Gladys Houston was killed. Also, three unidentified men, who had been seen in a bar near the stockyard between 6:30 and 7:00 p.m., left the bar driving a Cadillac with dealer plates and headed back toward Knoxville. The car was later seen parked at the stockyard between 11:30 p.m. and midnight. Two stockyard employees saw a man get out of the back seat of the car, go inside the building, and then return

to the car. Two other men were in the car. One of the employees later identified a photograph of Branam as resembling the person she saw get out of the car. There was also testimony that the defendant lived in the Sweetwater area and had previously worked at the stockyard.

The Cadillac was eventually identified as belonging to Ray Elliott, who was married to Branam's aunt. Ballistic testing indicated that cartridge casings found at Elliott's farm in Union County had been fired from the same nine-millimeter weapon used to kill Gladys Houston. Elliott, who was charged as an accessory before the fact, testified at trial that his brothers-in-law, Tommy Joe Walker and Ernest Walker, and their nephew, the defendant, came to his home in the summer of 1987. According to Elliott, Ernest Walker asked to borrow Elliott's 1980 Cadillac, and Branam indicated that they were going to Sweetwater to discuss "doing a job." Elliott testified that when the three men returned later that night, Ernest Walker handed him the keys to his Cadillac. At that point, Elliott testified, he learned for the first time that Tommy Joe Walker had taken Elliott's nine-millimeter semi-automatic gun. When Elliott, who admitted during testimony that he was high on cocaine at the time, asked what Tommy Joe Walker was doing with the gun, Walker indicated that "he had to shoot somebody with the gun," "a lady in Sweetwater;" that "something went wrong ... the lady pulled a gun ... [h]e had to shoot her." When Elliott said that he did not believe Walker, Branam said that "it was true—that Tommy Joe Walker flipped out and shot the lady." Tommy Joe Walker then threatened Ray Elliott, Elliott's wife, Naomi, the defendant, and Ernest Walker, indicating that if they said anything, they "would get the same thing the bitch got." Elliott testified that he later traded the gun for cocaine.

When questioned by officers in 1987 and 1988, Danny Branam denied any knowledge of the murder. After the arrest of Ray Elliott in March of 1989 as an accessory to first-degree murder, Naomi Elliott agreed to participate in the investigation. At least part of the incentive to cooperate with the authorities was her desire to show that her husband was not at the scene of the crime. She consented to be "wired" with a recording device in order to tape her conversation with the defendant when she visited him at Brushy Mountain State Penitentiary, where he was being held on another, unrelated charge. The tape of this conversation was played at trial. During the conversation, Branam made statements indicating that he had been present when Gladys Houston was shot. He explained that everyone had gotten out of the car but that he was in the background. During his description of the shooting, he stated:

BRANAM: What got me, there was never nobody never came out of that house ... this bitch was blowing that horn; honk, honk, honk, and that's after she'd done been shot two times, man. I don't know how many times she was hit. All I ... all I know that first hit, he dropped her head. And he was right beside the goddamn door, and she come around, and she'd have shot him, but the mother-fucker was on safety, and when she got the safety off, he bagged her ... running around behind the car. This bitch had her damn seat belt on and was still trying to turn around and shoot him.

ELLIOTT: Really?

BRANAM: Yes. (Inaudible) ... I started to run.

ELLIOTT: If somebody was to throw down on me I'd ... I'd say, take it, anything you want.

BRANAM: Yeah. You know what I'm saying. (Inaudible) this bitch scared me.

When T.B.I. agents later confronted the defendant with this tape-recorded conversation, he "just started melting down in the seat and, kind of, hanging his head." He may have cried as he commented, "Well, shit happens." When a detective urged him to talk to them, the appellant said, "[Y]ou cannot protect me from Tommy Joe Walker in the penitentiary."

Branam presented no evidence at the guilt phase of the trial, but he did present two witnesses during the penalty hearing. The first was a jail minister, who testified

that the defendant had discussed the Bible and prayed with him. The other witness was a correctional officer at the Brushy Mountain Penitentiary. He testified that Branam had worked as a "general rock," or custodian, at the prison because he had not caused a disciplinary problem of any kind while incarcerated.

The defendant contends that the evidence summarized above is insufficient to establish his guilt of any of the offenses for which he was convicted, because it fails to show his participation in or prior knowledge of the crimes. He argues, specifically, that the proof shows only that he was present at the commission of the offenses. The record shows, however, that Branam had been employed at the Houstons' stockyard; that he informed Ray Elliott that the three men were going to Sweetwater to see about "a job, something to do with making money"; and that he was close enough to the victim during the robbery and shooting to see her attempt to disengage the safety on her gun and twist in her seat belt in a defensive effort to shoot at Tommy Joe Walker. We conclude that the evidence is sufficient to establish the defendant's guilt on all three counts of the indictment.

### III. *Admissibility of the Confession*

■ The defendant makes a second attack on the legal sufficiency of the evidence, however, arguing that the proof would not sustain a conviction had his audio-taped statement to Naomi Elliott been properly suppressed by the trial court. He argues that the state's surreptitious use of a "jail-plant" to secure that statement violated his due process rights under the Fifth and Fourteenth Amendments to the federal constitution and under Article I, Section 9, of the state constitution.

The defendant's Fifth Amendment challenge is based on his claim that because he was "in custody" at the time he made the statement in question, he should have been advised of his *Miranda* rights before being "interrogated" by his aunt, Naomi Elliott, who was then acting as an undercover agent for the state. As a matter of federal law, this argument cannot be sustained.

In *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the United States Supreme Court held that an undercover law-enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect, even though the suspect's incriminating statements are elicited by questions posed by the undercover agent. Noting that "[c]oercion is [to be] determined from the perspective of the suspect," the *Perkins* court said further:

> Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.* The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate.... *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner.

*Id.* at 296–7, 110 S.Ct. at 2396–7.

In this case, the suspect's trust was "misplaced" in his own family member, with whom he was actively conspiring to obstruct an ongoing police investigation into the very offenses for which he was later charged and convicted. At the time of Naomi Elliott's prison visit, Branam was clearly a suspect in the Houston homicide case, but he had not been formally charged in connection with it. Thus, the defendant concedes that there was no violation of his Sixth Amendment right to counsel. In the absence of any evidence of police compulsion, we likewise find no violation of his Fifth Amendment right against self-incrimination.

The defendant nevertheless asks us, evidently as a matter of state law, to adopt the viewpoint expressed in a concurring opinion in *Perkins,* in which Justice Brennan decried the "deliberate use of deception and manipulation by the police," calling such practices "incompatible 'with a system that presumes innocence and assures that a conviction will not be secured by inquisitional means'." *Illinois v. Perkins, supra,* 496 U.S. at 303, 110 S.Ct. at

2400 (Brennan, J., concurring) (quoting *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985)). Invoking the Fourteenth Amendment's guarantee of due process, Justice Brennan would require a review of the "totality of the circumstances" surrounding elicitation of a suspect's statement by deceptive means, in order to ensure that the defendant's "will was [not] overborne." *Id.* Although we have no doubt that, under some circumstances, deceptive interrogation practices by law enforcement officers may be so unfair that they offend notions of due process, there is nothing in the record before us to suggest that Danny Branam's statements to Naomi Elliott, most of which were made spontaneously on his part, were the result of a will that had been "overborne."

While the defendant has alleged a violation of his rights under Article I, Section 9 of the Tennessee Constitution, he has not directed us to the specific clause upon which he bases his claim. We assume that his reference is to the guarantee found in Section 9 that an accused in a criminal case "shall not be compelled to give evidence against himself." In his only other reference to state law, the defendant cites language taken from our opinion in *State v. Berry*, 592 S.W.2d 553, 561 (Tenn.1980), to the effect that "[t]he law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which [they are] not permitted to do openly and honestly." But the defendant also concedes that *Berry* is wholly distinguishable from the case at hand, because it was decided strictly on the basis of the Sixth Amendment's guarantee of the right to counsel and not the right at issue here, against compelled self-incrimination, as found in either the federal or the state constitution.

Because we find no constitutional basis upon which to invalidate the defendant's inadvertent jailhouse confession, we hold that it was properly introduced into evidence at trial.

## IV. *Imposition of the Death Sentence*

There is another aspect of the defendant's trial, however, that does require us to grant relief because of insufficient evidence—that being the jury's decision, following Branam's conviction of felony-murder, that death is the appropriate penalty for his crime.

In assessing the death penalty, the jury specifically found two aggravating circumstances: (1) that the murder of Gladys Houston was committed to avoid, interfere with or prevent lawful arrest or prosecution of the defendant or another, T.C.A. § 39–13–204(i)(6); and (2) that it was committed during the commission of another felony (robbery), T.C.A. § 39–13–204(i)(7).

■ In attacking the first aggravating circumstance, that the murder was committed to avoid arrest or prosecution, the defendant presents two arguments. He initially insists that the jury should not have been instructed on this aggravating circumstance because the jury in the previous trial of his co-defendant Tommy Joe Walker had specifically rejected it. The defendant argues that this had the effect of acquitting Walker, the triggerman and thus the principal, of this aggravating circumstance. He then contends that if a principal is acquitted of an offense, an aider and abettor must also be acquitted, citing *Hudgens v. State*, 166 Tenn. 231, 60 S.W.2d 153 (1933), and *Pierce v. State*, 130 Tenn. 24, 168 S.W. 851 (1914), and that, as a result, this aggravating circumstance should not have been used against him.[1]

We find no merit to this argument. Current law provides that an aider and abettor may not invoke the acquittal of his principal as a defense in his own prosecution. *See* T.C.A. § 39–1–304. Thus, the action of the jury at Tommy Joe Walker's trial has no bearing on the question of which aggravating circumstances could be submitted to a different jury in Danny Branam's case.

---

1. The defendant also makes an argument in favor of "the application of defensive collateral estoppel," but he has cited no authority to support his contention that this doctrine may be invoked, outside the context of double jeopardy, in a criminal case.

The defendant's second argument has more substance to it. He contends that the evidence is insufficient to support this aggravating circumstance. We agree.

The proof elicited by the state at trial tends to show that Tommy Joe Walker "flipped out" and shot Gladys Houston because she tried to fire her gun at him. On appeal, the state theorizes that Houston was shot because she started honking her car's horn and thereby threatened detection of her assailants. However, two next-door neighbors testified unequivocally that the shots were fired before the horn began to sound. The defendant's statement to Naomi Elliott also supports this chronology. It speaks of a robbery "gone wrong", and not a deliberate decision on the part of any of the three men involved to kill for the purpose of avoiding apprehension.

The only other possible theory supporting the existence of a subsection (i)(6) aggravating circumstance is the argument that because the defendant had previously worked at the victim's stockyard, it could be inferred that the victim might recognize him. But there is not a shred of evidence in the record to prove that this consideration motivated Tommy Joe Walker to shoot Gladys Houston.

We therefore hold that the trial court, faced with such an obvious paucity of evidence to establish a subsection (i)(6) situation, should not have instructed the jury on this aggravating circumstance. Hence, the jury's finding on subsection (i)(6) must be set aside.

In the past, when this Court has set aside one of a number of aggravating circumstances as improperly submitted, we have generally held that the case must be remanded for a new hearing on punishment. T.C.A. § 39–13–204(k) (1991). *See, e.g., State v. Williams,* 690 S.W.2d 517, 533 (Tenn.1985); *State v. Pritchett,* 621 S.W.2d 127, 139 (Tenn.1981); *State v. Moore,* 614 S.W.2d 348, 352 (Tenn.1981), *cert. denied,* 454 U.S. 970, 102 S.Ct. 517, 70 L.Ed.2d 388 (1981). In this case, however, the only remaining aggravating circumstance—murder committed in the course of another felony—cannot be considered upon remand, under the rule recently announced by the Court in *State v. Middlebrooks,* 840 S.W.2d 317, 319 (Tenn.1992). It follows that under state law, the defendant cannot be sentenced to death and his sentence must be set at life imprisonment.

We think the same result is required by federal law. In *Enmund v. Florida,* 458 U.S. 782, 789, 102 S.Ct. 3368, 3372, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that death is a disproportionate penalty and, therefore, constitutes cruel and unusual punishment under the Eighth Amendment, where it is imposed against a defendant "solely for participation in a robbery in which another robber takes life," without proof that the defendant himself attempted or intended to kill, or intended that lethal force be used. This constitutional standard was refined by the Court in *Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), in which it was held that the Eighth Amendment does not prohibit the death penalty in the case of a defendant whose participation in a felony that results in murder is major and whose mental state at the time is one of reckless indifference to the value of human life—even though the proof fails to show intent to kill.

A detailed recitation of the facts in these two cases is unnecessary to this opinion. It is sufficient to note that Danny Branam's involvement in the robbery of Gladys Houston was more significant than that of the getaway driver in the robbery in *Enmund,* but clearly less significant than the involvement of the defendants in *Tison.* In the latter case, the Tison brothers brought "an arsenal of lethal weapons" into an Arizona prison and handed them over to two convicted murderers, one of whom had killed a prison guard during a previous escape. By prearrangement, the defendants assisted the two inmates (one of whom was their father) in their escape and, during flight, kidnapped four passing motorists. At one point the Tison brothers held the motorists at gunpoint and later watched as the victims were shot, although they did not participate in the executions.

In contrast, in this case there is no evidence to show that Danny Branam was ever in possession of the murder weapon or that he personally approached or confined the victim at any time during the robbery. Although he now insists that the proof fails to show that he knew that Tommy Joe Walker was armed, we conclude that Ray Elliott's testimony indicates that he did. Nevertheless, other than Branam's participation in the felony and his probable awareness that Tommy Joe Walker was armed, there is nothing in the record to establish the defendant's mental state as one of "reckless indifference", as that term is used in *Tison*. Because, therefore, the death penalty would be disproportionate to the offense committed by Branam, its imposition under these facts would, in our judgment, constitute a violation of the Eighth Amendment's guarantee against cruel and unusual punishment.

Based on our conclusion that capital punishment is precluded in this case by both the state and the federal constitutions, we reverse the penalty portion of the trial court's judgment and order that, upon remand, the defendant be resentenced in accordance with this opinion.

## V. *Brady Hearing*

Remand is required in this case for a hearing on one other issue, in addition to punishment. In his brief on appeal, the defendant contends that the state failed to provide pretrial discovery of a statement by a prosecution witness named Calvin Hurst, who allegedly told police during their investigation of the Houston homicide that Ray Elliott had indicated to Hurst that Elliott had been directly involved in the murder, along with the defendant and the Walkers. The defendant contends that because this evidence is favorable to him and material both to guilt and to punishment, the failure of the state to disclose it prior to trial violated his right to due process, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Despite having filed a specific motion for disclosure of *Brady* material, defense counsel allegedly did not become aware of the existence of Calvin Hurst's statement until Ernest Walker's trial in May and June of 1991, a year after Branam was tried and convicted. Counsel first apprised this Court of the alleged *Brady* issue in a motion to remand, requesting consideration of an amended motion for a new trial based on post-judgment facts. We denied the motion to remand, and the defendant again raised the claim in his appellate brief. However, the piece of evidence in question was not presented during the Branam trial and, thus, is not within the record before us. Counsel accordingly filed a second motion requesting that the evidence be inserted into the record to "correct or supplement" it, pursuant to Rule 24(g) of the Tennessee Rules of Appellate Procedure.

The state responds that Rule 24(g) does not allow the admission of evidence from a separate case (specifically, the trial of Ernest Walker) to correct or supplement the record from the trial of Danny Branam. The state also contends that an appellate court may not consider evidence which has not been introduced at trial or certified as part of the record by the trial court. We agree with the state's interpretation of Rule 24(g). However, we also conclude that the evidence in question is admissible under Rule 14 of the Tennessee Rules of Appellate Procedure.

Rule 14 specifically authorizes this Court to consider post-judgment facts on appeal. In an opinion interpreting the predecessor to Rule 14, we held that a remand was necessary to gather additional evidence for resolution of an issue which was not previously available to the defendant. *Pruett v. State,* 501 S.W.2d 807, 809 (Tenn.1973). *Pruett* involved a post-conviction appeal raising a double jeopardy defense that had not been recognized at the time of trial. For this reason, facts tending to establish double jeopardy had not been developed at trial. Thus, through no fault of his own, the defendant came before this Court with an apparently valid constitutional claim that was nevertheless lacking in factual support. We ordered a remand to the trial court to permit the defendant to introduce facts in support of his claim. We noted

that our holding was consistent with the interests of judicial efficiency, given the fact that the appellant could have filed a completely new post-conviction claim based on the recently announced double jeopardy principle. *Id.*

Both before and after the advent of Rule 14, the courts of this state have allowed introduction of post-judgment facts in a number of appeals. *See, e.g., State v. Nance,* 521 S.W.2d 814, 816 (Tenn.1975) (remand appropriate where facts insufficient to review alleged speedy trial violation); *State v. Gourley,* 680 S.W.2d 483, 485 (Tenn.Crim.App.1984) (remand required where record contained "not one shred of competent evidence" regarding search of vehicle); *State v. Crawford,* 783 S.W.2d 573, 578 (Tenn.Crim.App.1989) (remand ordered where procedural confusion from lack of precedent resulted in record devoid of fact); *see also State v. Mitchell,* 593 S.W.2d 280, 285 (Tenn.1980) (remand appropriate where record inadequate to review admissibility of in-court identification). We likewise conclude that remand in order to consider the *Brady* question in this case is required. Indeed, if we declined to review the issue on direct appeal, it would undoubtedly resurface in a petition for post-conviction relief and, perhaps, lead to the necessity of a retrial many years after Branam's original conviction. Accordingly, we remand the case to the trial court for determination of the alleged violation of *Brady v. Maryland* upon a consideration of the post-judgment facts submitted by the appellant.

 We are cognizant that the power bestowed upon this Court by Article VI, Section 2 of the Tennessee Constitution is not boundless. Ours is an appellate jurisdiction, and consideration of post-judgment facts must be limited accordingly. *Duncan v. Duncan,* 672 S.W.2d 765 (Tenn. 1984). We have consistently refused to consider facts arising after trial that were central to the trial and genuinely disputed by the parties. *Id.* at 768; *Fine v. Lawless,* 140 Tenn. 453, 205 S.W. 124 (1918); *see also Jones v. Mulkey,* 620 S.W.2d 498 (Tenn.App.1981). But, the facts that Branam now presses upon us, if his allegations are proven to be correct, concern a matter that was not contested and could not have been contested at trial, because evidence was unconstitutionally withheld from the defense. Remand will permit the trial court to determine whether or not a violation of due process has occurred in this case.

## VI. *Conclusion*

For the reasons set out above, we order that the trial court's judgment regarding punishment be reversed and that the case be remanded to the trial court to permit resentencing and for a hearing to determine the effect of post-judgment facts on the constitutional validity of the defendant's convictions.

Reversed in part and remanded.

REID, C.J., and ANDERSON, J., concur.

DROWOTA and O'BRIEN, JJ., concur with separate concurring opinion.

DROWOTA, Justice, concurring.

The Defendant, Danny Branam, appeals his conviction of first degree felony murder and his sentence of death. The jury found two aggravating circumstances: the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Defendant or another; and the murder was committed while the Defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit ... robbery. T.C.A. § 39–2–203(i)(6) and (7) (1982) [now § 39–13–204(i)(6) and (7) (1991)].

The majority found that both aggravators should be set aside and that the Defendant's sentence "must be set at life imprisonment." I agree that the evidence is insufficient to support subsection (i)(6). However, I continue to adhere to my dissent in *State v. Middlebrooks,* 840 S.W.2d 317, 347 (Tenn.1992), and would find the evidence sufficient to support the felony murder aggravating circumstance, subsection (i)(7).

With one valid aggravating circumstance remaining, I am unable to conclude that the injection of aggravating circumstance (i)(6) into the jury's sentencing calculus is harmless error beyond a reasonable doubt. I would therefore remand for resentencing but for my agreement with the conclusion in the majority opinion that the sentence of death is disproportionate in this case.

In *Middlebrooks,* I stated:

In order to prevent the execution of all but the most deserving of murderers and to avoid arbitrary and capricious sentencing, the Court reviews all felony-murder cases to assure that a sentence of death has not been arbitrarily imposed, that the evidence supports the jury's findings and that the sentence of death is not disproportionate. For purposes of the death penalty, a distinction must be drawn in felony-murders between cold-blooded, execution-style murders and accidental, unforeseen killings or *accomplice* killings (Emphasis added.).

840 S.W.2d at 349. This accomplice killing certainly is not one of the "worst of the bad" as described by Chief Justice Reid in *Middlebrooks.*

In *State v. Taylor,* 774 S.W.2d 163 (Tenn. 1989), the only other case in this State in which a sentence of death has been imposed upon a non-triggerman aider and abettor to felony murder, the defendant handed the killer the murder weapon, nodded to him to shoot the victim, who was seated in front of the killer, and shot the victim's body afterwards. Branam's role in the present offense is much less culpable. Pursuant to this Court's statutory directive under T.C.A. § 39–13–206(c)(1)(D), I would find that the sentence of death is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Furthermore, the State has not proved the Defendant's culpability in the killing is sufficient to impose the death penalty under either the state or federal constitution. Because the Defendant does not meet the second prong of the test of *Tison v. Arizona,* 481 U.S. 137, 155, 107 S.Ct. 1676, 1686, 95 L.Ed.2d 127 (1987), in that he did not possess a mental state of reckless indifference to human life, *id.,* at 156, 107 S.Ct. at 1688, the imposition of the death penalty under the present record would violate the Eighth Amendment to the United States Constitution and Article I, § 16, of the Tennessee Constitution. I therefore concur with the results reached in the majority opinion in sentencing the Defendant to life imprisonment.

I am authorized to state that Justice O'BRIEN concurs in this opinion.