IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2012 Session

## STATE OF TENNESSEE v. ROBERT EDWARD BOLING

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S52,723      Robert H. Montgomery, Judge**

_____

**No. E2011-00429-CCA-R3-CD - Filed March 5, 2013**

_____

This is the second appeal as of right by Defendant, Robert Edward Boling, from his conviction in the Sullivan County Criminal Court for aggravated robbery. In his first appeal as of right, this Court addressed only the issue of the sufficiency of the evidence to sustain the conviction, affirmed the conviction on that issue, and refused to address all other issues because they were waived by Defendant's attorney's failure to timely file a motion for new trial. *See State v. Robert Edward Boling*, No. E2008-00351-CCA-R3-CD, 2009 WL 482763 (Tenn. Crim. App. Feb. 26, 2009) *no perm. app. filed*. Subsequently, Defendant timely filed a petition for post-conviction relief. The post-conviction court granted Defendant a delayed appeal pursuant to Tennessee Code Annotated section 40-30-113(a)(1)("When the trial judge conducting a hearing pursuant to [the Post-conviction Procedure Act] finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee . . . the judge can . . . grant a delayed appeal;"). In accordance with our supreme court's opinion in *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003), the untimely motion for new trial being a nullity, Defendant was granted the ability to file a timely motion for new trial. He did, and it was overruled. Defendant now appeals his conviction for the second time and appropriately raises two issues for our review in this appeal: (1) the trial court erred by denying his motion for new counsel; and (2) the trial court erred by denying his objection to certain photographs and testimony, which Defendant asserts were "fruit of the poisonous tree" of his coerced confession. Defendant's third issue, the post-conviction claim of ineffective assistance of counsel at the trial, is premature. After a review of Defendant's two properly presented issues, we again affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Dan R. Smith, Johnson City, Tennessee, for the appellant, Robert Edward Boling.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; H. Greeley Welles, Jr., District Attorney General; and William B. Harper, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

The facts of this case were summarized by this court in its previous opinion on direct appeal:

> At trial, the victim testified that, on October 5, 2006, she and her husband had been shopping at the Kroger grocery store on Stone Drive in Kingsport, Tennessee. Her husband parked their vehicle near the back of the parking lot, "quite a ways from Kroger." She testified that she "looked around and saw a man" and that she first thought he was an employee collecting shopping carts from the parking lot. She said, "Well all of a sudden I had a jerk and he jerked my purse off and I said 'He got my pocketbook,' that's all I seen." Her husband ran after the assailant. She testified that her "pocketbook" contained her credit cards, checkbook, and $70 in cash, and she confirmed she did not give the defendant or anyone else permission to take it from her.
>
> The victim testified that she fell as a result of the robbery and that she was subsequently taken to Indian Path Hospital. She said, "I don't remember falling but I fell and when I did come to myself the rescue squad men w[ere] taking me in . . . I was really in pain." She testified that she suffered a contusion to her head and a broken left arm. She testified that she could not use her left arm for any purpose "for a long time" and that the arm "still g[ave][her] trouble."
>
> Doctor James H. Burleson, who worked at Indian Path Hospital, treated the victim in the emergency room after the robbery, and he testified at trial as an expert in emergency medicine. He stated that the victim "was complaining with left shoulder pain and left knee pain and [he] did x-rays." He reported that "the x-ray . . . show[ed] that she [had] a fracture of her proximal humorous of her left arm," and he explained that "[t]he long bone of the left arm at the shoulder joint was where it was broken." He testified that the victim continued

to suffer from an "overall decreased range of motion in her left shoulder" and "associated pain." Doctor Burleson stated, "I would believe that she would have continued arthritic type pain with that shoulder." He further stated that the victim's injuries were consistent with another person grabbing her purse and knocking her to the ground and her landing on her left shoulder.

Tracy Lawson testified that she worked for MR Cleaners and delivered laundry among the company's different locations in the area. She stated that on October 5, 2006, she made a delivery to the MR Cleaners located in the same shopping center as Kroger. Ms. Lawson "saw somebody walk around the corner of the building." She recalled that she payed particular attention to this individual because "nobody ever c[a]me around that corner except for the employees that worked there because that's where [employees] parked." She testified that, as she unloaded the delivery van, she heard somebody yell, "'Stop motherf[---]er.'" She then "saw the same guy that had walked by [her] running back, he r[a]n right back in front of [her] carrying a woman's pocketbook and then [she] saw another man chasing him and then an elderly man chasing him." She testified that the man with the victim's purse "had on an orange t-shirt, baseball cap, [and] blue jeans" and that he "had a little bit of a goatee."

Ms. Lawson stated that, after seeing the men pass, she "told one of the girls . . . that worked there . . . 'Call 911, he's just stole somebody's pocketbook.'" She later described what she observed to law enforcement officers. Later that day, the police brought an individual to MR Cleaners for the purpose of having Ms. Lawson make an identification. She testified that, although "[h]e had changed clothes and took his hat off," there was "no doubt" in her mind that the man in police custody was the perpetrator. She identified the man as the defendant in court.

Larry Beckner testified that, on October 5, 2006, he was riding in the back of his mother's minivan in the Kroger parking lot when he "heard . . . a man . . . hollering out about stopping [and] somebody grabbed his wife's pocketbook." Mr. Beckner testified that he "dove out of the van and chased the fellow around the building of the store." He clarified that he did not witness the actual robbery and that he only saw a man running with a pocketbook.

Mr. Beckner testified that he chased the man and tried to "football tackle" him, but "the only thing [he] did was grabbed [sic] a hold of his

britches leg which he eventually got loose." He testified that he had a brief conversation with the man and asked him to throw the pocketbook back to him. He said the man "finally threw down the pocketbook and the old man was standing beside of me and I handed him the pocketbook and he checked it to make sure that everything was in it." The man then ran up a hill and into a wooded area.

Mr. Beckner said that the man "had like a ball cap on, sun glasses, sort of stubby facial hair, like reddish blond, a reddish color." He explained, "He had on a pair of blue jeans, an orange shirt and I think like . . . work boots or something like that." Mr. Beckner stated that he spoke with the police later that day. Mr. Beckner was unable to identify the defendant as the man he had chased. On cross-examination he explained that he could not see the man well because "the sun was sort of in [his] eyes."

Officer David Johnson of the Kingsport City Police Department testified that he responded to a call that a robbery had taken place at Kroger. He arrived at the scene and "[s]et up a perimeter." The first description he obtained of the man "was a white male, goatee, bald, wearing blue jeans, an orange shirt and a ball cap . . . black with a large B on it." He stated that "[a] short time into the search" he received information that the man "may have switched into a gray t-shirt."

Officer Johnson located a man that he suspected to be the perpetrator at a picnic bench. The man "had his head down on the table but . . . [was] wearing a gray t-shirt and a shaved head." He testified, "[The man] had a long mustache matching the description and then after I had handcuffed him for my safety I noticed behind him a black ball cap matching the description." Officer Johnson stated that the baseball cap was "a couple of feet" behind the suspect. He explained that the man's mustache "c[a]me all the way down to his chin area from all the way across." The mustache "stayed close to his face and just ran down his face down to his chin." He identified the man at the picnic table as the defendant.

Shirley Aston testified that she worked as the cashier at a J's Food Mart convenience store on October 5, 2006. She testified that she had known the defendant for "a long time" because his mother had been her "boss." She stated that the defendant came to the convenience store on October 5 to buy lottery tickets.

-4-

Ms. Aston testified that the convenience store was equipped with a security camera system and that she had used photographs from the camera system on previous occasions. She identified herself and the defendant in a picture taken by the camera system on October 5, 2006. The trial court admitted the photograph from the convenience store security camera into evidence. The photograph showed that the defendant wore a black baseball cap, orange tee shirt, and blue jeans.

*State v. Robert Edward Bowling* [sic], E2008-00351-CCA-R3-CD, 2009 WL 482763 (Tenn. Crim. App. Feb. 26, 2009)

*Pretrial Hearing - Motion New Counsel*

At the hearing, the trial court noted that Defendant had filed some complaints against trial counsel with the Board of Professional Responsibility. Defendant indicated that he wanted answers to "just some basic questions about his case and [he had] made several attempts to contact [trial counsel] on several attempts and never got a response of any kind." Trial counsel then informed the court as follows:

> The first thing in the bar complaint asks for, it says, the first sentence of the bar complaint is, "All I want if you all - - - - is you to get me a new attorney." And that's how it begins. Now, it does indicate, his complaint does indicate that he believes that I am working with the prosecution. That is alleged in it. He feels - - - - I don't think he says, "You're working for the prosecution," but at one point in time in the complaint he indicates that he is in fact - - - - has the feeling that I am not working for him but I am instead working for the prosecution.

Defendant stated that he felt like the "sacrificial lamb." He also told the trial court that during his bond reduction hearing, trial counsel asked him the same questions as the prosecutor. He claimed that the "prosecutor just kind of smiled when he stepped up because the questions he was going to ask had already been answered."

The trial court noted that it was not unusual in a bond reduction hearing for both sides to ask the same questions. The court pointed out that both sides know the statutory items looked at by the court when setting a bond such as: "the length of time in the community, your family ties, where you've been working, how long you've been working here and what's your address, what your prior criminal record is, what kind a financial assets do you have." Defendant then asserted that his bond should not have been raised and testified that the court raised his bond because he did not have anyone to testify on his behalf. However, he claimed

that he told trial counsel that he had a list of witnesses who were ready to testify as to his character and employment. The trial court noted that Defendant's prior criminal record was his biggest problem; however, Defendant said that the trial court indicated that it would not take his record into consideration because the charges were more than twenty years old. The trial court pointed out that aggravated robbery was not a probatable offense, and due to his number of prior convictions, Defendant was a career offender.

Concerning Defendant's request for new counsel, the trial court asked trial counsel if he felt that he could continue to represent Defendant "under [trial counsel's] oath." The following exchange took place:

[TRIAL COUNSEL]: Under my oath, yes.

THE COURT: As an attorney.

[TRIAL COUNSEL]: It would be difficult. The reason is he has obviously filed two bar complaints against me indicating that I have - - - - that I am - - -

THE COURT: You don't have any evidence that he's conspiring with the State other than the fact that his questions at a bond hearing were similar to the State's questions. Is that what you're saying?

[DEFENDANT]: Yes, sir.

[TRIAL COUNSEL]: And obviously under my oath - - -

THE COURT: To represent a client - - -

[TRIAL COUNSEL]: What I told him today was once - - - - that it is my intention, we're a month away. I have obviously - - - - I have discovered the case. I have indicated to him that I would be filing a motion to suppress his two statements as of the moment I'm told whether I'm still on this case or not. And that's the motion that he had indicated to the bar that - - - - he had motions that he wanted me to file and that is by and large the, if I'm not mistaken, that

-6-

is the motion that you want filed above all, to suppress the statement and - - -

THE COURT: Well, that's a logical thing - - -

[TRIAL COUNSEL]: And that's the logical thing to do and I have not done so up until this time. Obviously Your Honor knows that I've had 9 trials in this court this year and I now have, you know, between now and the trial date I have nothing - - - - well, I have two trials set but they are not as - - - - I've discovered them in - - - - in August and I can do those cases but I have the opportunity to get this case ready for trial and there is no - - - - and the prosecution has made it clear that this case is going to trial because they are not willing to make an offer than - - - -I mean he can plead blind and as a result I don't have any choice considering that they have alleged that he is a career criminal to do anything but go to trial because - - - - you know, if he pleads blind and they put on that he's a career criminal you have no - - - - you can't do anything but give him 30 years if they prove it. So I've indicated to him from the get go that this would be a trial. There's just nothing we - - - - I can't force the prosecution into a lower - - - - you know, anything lower. But obviously, Your Honor, if you say that I am still on the case I will zealously represent him. It will be difficult, however, based on his lack of trust.

THE COURT: Well, [Defendant], [trial counsel] is a good attorney. I mean you may not see him as often as you think you ought to see him but he's a good attorney and he's tried an awful lot of cases in my court. In fact we just had a case here two weeks ago that he represented a gentleman that was charged with an A felony. Right? Isn't that the case, [trial counsel]?

[TRIAL COUNSEL]:     That is true.

THE COURT:     He was found guilty of an A misdemeanor. I mean it was a well tried case. The jury heard an awful lot of proof and an [awful] lot of evidence and I'm not saying that that's going to happen in your case but I want you to know [trial counsel] is a good attorney and he does well. Now, his schedule may not be your schedule. I mean he may - - -

[DEFENDANT]:     Mine is pretty much open all the time.

THE COURT:     Well, I understand that but you understand what I'm saying.

[DEFENDANT]:     Yeah.

THE COURT:     I mean his schedule is not your schedule and he has to - - - - I mean and you're not his only case. I mean I wish that the lawyers that are representing people that are charged with crimes, particularly crimes as serious as yours, I mean can take your case and only have your case and be responsible for your case from beginning to end and not have to worry about anybody else. But that's just not the nature of the way this works. I mean but I have found that all the lawyers in the public defender's office, when they try a case they're well prepared. Their clients are prepared. They've thought through what the best defense is in the case and they do well and [trial counsel] is no exception to that. I mean I understand what you're saying. I mean if I were sitting here thinking about the possibility that I might be - - - - I mean, you know, you're not a young man certainly, but serving a 30 year - - - - but you're not an old man either. But serving a 30 year sentence and with a prior record you don't know, there may not be 60%. If I were looking at having

-8-

to do that much of my life [i]n prison certainly I would be really concerned and I understand your concern but at this point in time I'm not seeing anything here today that would cause me to be willing to relieve [trial counsel] as your lawyer. Now, I mean I want to try this case September 10th because I think you deserve that; not any rush to judgment, that's not what's going on here. I mean this is a serious charge that's hanging over your head and I will go ahead and set a motion day so if [trial counsel] has motions that he needs to have heard in this matter we'll hear them. I'm not going to put that off because you need to know and it the motions might make a difference and there are other things that come up - - -

*Motion for New Trial*

At the hearing on defendant's motion for new trial, defense counsel made the following argument:

[W]e suggest that the court erred during the course of the trial when it refused to permit a change of attorney occasioned by [Defendant's] request for a new attorney. [Defendant] alleged at that time that he had filed several complaints with the Board of Professional Responsibility and that there had been no, as paragraph two indicates, absolutely no communication between he and his attorney except for the two or three or four court appearances that he had. We believe that given that particular information before the Court at the time that the Court should have permitted a change of attorneys at that time and we believe that that does in fact rate, or should be considered for purposes of new trial.

Concerning the issue of whether the trial court erred by denying Defendant's objection to certain photographs and testimony, which Defendant asserts were "fruit of the poisonous tree" of his coerced confession, defense counsel further argued:

There initially was a Motion to Suppress before the Court that alleged duress or intoxication of the defendant at the time a statement was given. As I understand the testimony from our post-conviction hearing and during the course of this trial initially there was an agreement between the defendant and

-9-

the State that the statement would not be used. Because that agreement was made in front of the Court there was a determination that no hearing would be necessary on it and that the statement would not be admitted. During the course of the trial evidence gleaned from that statement was admitted over the objection of the defendant and at the time of the trial when this arose there was no hearing by the Court to determine whether or not that fruit of the poisonous tree would have been applicable in this particular situation and we believe that the Court erred in not having a hearing at that time with the jury out to determine whether or not this evidence was in fact derivative from the statement that had been agreed to be suppressed.

The record reflects that prior to trial, Defendant filed a motion to suppress his statements to police because they were allegedly coerced. In a pretrial hearing, the State informed the trial court that it did not intend to use Defendant's statements during its case-in-chief. Therefore, the trial court did not rule on the motion. During the trial, Defendant objected to two photographs and testimony by Shirley Aston on the basis that the State would not have known about them except through Defendant's alleged coerced statements. He argued that two photographs of Defendant wearing an orange shirt and testimony by Ms. Aston that Defendant was at the convenience store where she was employed approximately one hour before the robbery was inadmissable because the evidence was "fruit of the poisonous tree." However, the trial court overruled the objection.

## II. Analysis

*Denial of Request for New Counsel*

"Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000). "The right of an accused to assistance of counsel, however, does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *Id* . "The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant." *Id.* "[A] trial judge may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant in a criminal case." *State v. Branham*, 855 S.W.2d 563, 566 (Tenn. 1993); *see also* Tenn. Code Ann. § 40-14-205. A trial court has wide discretion in matters regarding the withdrawal of counsel, and its decision will not be set aside unless "a plain abuse of that discretion is shown." *Id*.

In *State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991), this court held:

When an accused seeks to substitute counsel, the accused has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them.

*Id*. (footnotes omitted).

Additionally, a defendant must demonstrate that he or she was prejudiced by the trial court's denial of a motion to withdraw as counsel. *Branham*, 855 S.W.2d at 566.

In this case, the trial court did not abuse its discretion in denying Defendant's request for new counsel. In a pre-trial hearing, the trial court noted that Defendant had filed "some complaints" against trial counsel with the Board of Professional Responsibility. Defendant told the trial court that he filed the complaints because he wanted "just some answers to just some basic questions about [his] case and [he] made several attempts to contact [trial counsel] on several attempts [sic] and never got a response of any kind." Trial counsel pointed out that in one of the complaints, Defendant indicated he believed trial counsel was working for the prosecution and not for him. Defendant then told the trial court that he based his belief on the fact that trial counsel asked the same questions as the prosecution at his bond reduction hearing. The statements made during this hearing are detailed above.

Defendant argues that there was an actual conflict of interest because he had filed complaints against trial counsel with the Board of Professional Responsibility. "In order to demonstrate a violation of the defendant's right to conflict-free counsel, the defendant must show that there was an actual conflict of interest that adversely affected the lawyer's performance." *State v. Street*, 768 S.W.2d 703, 708 (Tenn. Crim. App. 1988). Defendant relies on *Smith v. Lockhart*, 923 F.2d 1314 (8th Cir. 1991), and *Douglas v. United States*, 488 A.2d 121 (D.C. 1985) in support of his claim. However, Defendant's argument is misplaced. In *Smith*, the Eighth Circuit concluded that the defendant was denied the right to counsel at a critical stage of the criminal proceedings, an "omnibus hearing," after the trial court refused to appoint new counsel after the defendant filed a federal lawsuit against trial counsel alleging a conspiracy of county officials to violate the rights of defendants. The *Smith* Court held: "A federal lawsuit pitting the defendant against his attorney certainly suggests divided loyalties and gives the attorney 'a personal interest in the way he conducted [Smith's] defense - an interest dependent of, and in some respects in conflict with, [Smith's] interest in obtaining a judgment of acquittal.'" *Smith*, 923 F.2d at 1321 (quoting *Douglas v. United*

*States*, 488 A.2d 121, 136 (D.C. App. 1985)). In *Douglas*, the trial court *sua sponte* declared a mistrial after defendant filed a complaint with the Bar Counsel, who was opening an inquiry into trial counsel's conduct. Both the defendant and trial counsel had unambiguously expressed a desire for the trial to continue with trial counsel's representation. *Douglas*, 488 A.2d at 126. The court in *Douglas* determined that the trial court declared a mistrial in the defendant's case without "evincing any concern for the double jeopardy consequences of its actions or for the appellant's constitutional right to counsel of choice, and without giving adequate consideration to the less drastic alternative-waiver of conflict-free counsel - that appears from the record to have been available." *Douglas*, 488 A.2d at 145.

Concerning this issue, Tennessee courts have held:

[T]rial counsel is not required to withdraw representation merely because a client has filed a complaint against him with the Board. *See Quentin Lewis v. State*, No. W1998-00793-CCA-R3-PC, [ ], 2001 WL 55635 (Tenn. Crim. App. Jan. 23, 2001) (holding trial counsel's performance was not rendered constitutionally deficient by virtue of her failing to request to withdraw after appellant filed a complaint against her with the Board); *Cf. State v. Richard Higgs,* No. W2000-02588-CCA-MR3-CD, [ ], 2002 WL 1841697 (Tenn. Crim. App. Aug. 5, 2002) (although three complaints had allegedly been filed with the Board concerning trial counsel by the defendant at the time of trial, the defendant had "not provided this Court with sufficient information to determine that there existed a conflict of interest requiring defense counsel's withdrawal"). Any rule that would essentially permit a defendant to automatically discharge his appointed counsel simply by raising written complaints would inevitably become the subject of delaying tactics and abuse. *Cf. State v. Willis*, 301 S.W.3d 644, 652 (Tenn. Crim. App. 2009) (wherein "[t]he defendant used the tactic of . . . filing complaints against [his lawyers] with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and . . . the pattern was for the tactic to be employed as trial dates approached").

*Shaun Alexander Hodge v. State*, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503 at *5 (Tenn. Crim. App. Aug. 26, 2011) *perm. app. denied* (Tenn. Feb. 15, 2012).

Defendant in this case has not established that the representation furnished by trial counsel was ineffective, inadequate, and fell below the range of competency expected of defense counsel in criminal prosecutions; that he and trial counsel had become embroiled in an irreconcilable conflict; there had been a complete breakdown in communications between them; or that there was an actual conflict of interest. Based on the record before us, we

cannot conclude that the trial court abused its discretion in denying Defendant's request for new counsel.

*Admission of Photographs of Defendant and Testimony by a Convenience Store Clerk*

Next, Defendant contends the trial court erred in allowing the State to introduce testimony of Shirley Aston, a convenience store clerk, who testified that she knew Defendant and that he was in the store, located approximately one mile from the robbery, one hour prior to the robbery wearing an orange t-shirt. The State also introduced two photographs taken from the surveillance video at the store where Ms. Aston worked showing Defendant wearing an orange t-shirt; however, he was arrested shortly after the robbery wearing only a grey t-shirt.

Prior to trial, Defendant filed a motion to suppress his two statements given to police after the robbery. In the motion, he asserted:

> The Defendant would show that certain statements were taken from the Defendant by Detective Cole of the Kingsport Police Department and other officers unknown, on October 5, 2006. The Defendant contends that said statements and the fruits thereof are inadmissible, illegal and taken in violation of the Defendant's rights in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Sections, Seven, Eight, and Nine of the Constitution as well as certain statutes, rules and laws of the State of Tennessee. Defendant alleges that he was under duress and was not able to knowingly and voluntarily waive his rights.

However, prior to trial, the State announced that it would not use Defendant's statements during its case-in-chief. The trial court stated: "All right, so that kind of takes care of that [m]otion, then." There was no mention of Ms. Aston or the two photographs, and Defendant did not file a motion to suppress the evidence.

Near the close of its proof, the State sought to admit testimony by Ms. Aston and the photographs. Trial counsel objected to the evidence because the State "agreed that the statement[s] would be suppressed," and the State learned of Ms. Aston and the photographs from one of Defendant's alleged coerced statements. Therefore, he argued, the evidence was "fruit of the poisonous tree." The trial court overruled the objection noting that it did not rule on the motion to suppress "because the State basically dealt with the issue . . ." Trial counsel admitted that he was aware of the photographs from discovery but did not file a separate motion to suppress them.

Rule 12(b)(2)(C) of the Tennessee Rules of Criminal Procedure provides that motions to suppress evidence must be filed prior to the trial. *See State v. McCray*, 614 S.W.2d 90, 94 (Tenn. Crim. App. 1981). "The rule is applicable when a claim of a constitutional right is involved whose violation would lead to suppression of evidence." *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998). Failure to timely present a motion to suppress to the trial court constitutes a waiver of the issue for appellate review, "in the absence of 'cause shown' for the failure." *McCray*, 614 S.W.2d at 94. In this case, the trial court made no findings that Defendant's statements were involuntary or the result of duress or coercion, and Defendant did not file a motion to suppress the photographs or testimony by Ms. Aston. For these reasons, we conclude that the trial court did not err by allowing the evidence to be admitted at trial.

*Ineffective Assistance of Counsel*

Finally, Defendant contends that trial counsel was ineffective for: (1) failing to communicate with Defendant; (2) failing to investigate or challenge the "show-up identification;" (3) failing to move to suppress the evidence derived from the alleged coerced statement made by Defendant. However, this Court entered an order dated August 30, 2011, containing the following language:

> The trial court erred in proceeding with the post-conviction claims and the delayed appeal. The best remedy to facilitate the trial court's responsibilities upon resolution of the delayed appeal is to remand the case to the trial court. Therefore, it is hereby ORDERED that the judgment of the trial court denying relief on the Petitioner's post-conviction claims is reversed and the case is remanded to the trial court to be held in abeyance until the delayed appeal is resolved.

Therefore, these issues are not properly before this Court.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court is affirmed.

THOMAS T. WOODALL, JUDGE