IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 22, 2012

## STATE OF TENNESSEE v. ROCKY JOE HOUSTON

**Appeal from the Criminal Court for Roane County**
**No. 13226    Jon Kerry Blackwood, Senior Judge**

**No. E2011-01855-CCA-R3-CD - Filed February 11, 2013**

The defendant, Rocky Joe Houston, was convicted on April 1, 2010, of reckless endangerment, a Class A misdemeanor, and evading arrest, a Class E felony, for which he was sentenced, respectively, to eleven months, twenty-nine days and one year, as a standard offender.  In his notice of appeal, he asserted that the trial court erred in denying the judgment of acquittal and asked that this court order the lawyer in his 2008 trial to return the sum of $65,000, which was a portion of the amount the defendant asserts he paid to the lawyer.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Rocky Joe Houston, Ten Mile, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Russell Johnson, District Attorney General; and Kenneth F. Irvine, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This matter has a complicated and contentious history, as we will set out.

The defendant was tried in 2008 for several offenses resulting from the 2006 deaths of William Birl Jones and Gerald Michael Brown, and, at the conclusion of that trial, the jurors reported to the trial court that they were unable to reach a verdict.  The court asked

if they were able to reach verdicts on any of the lesser included offenses and was told that they could not. The court then dismissed the jury without declaring a mistrial. Consequently, the defendant argued that he could not be retried upon any of the offenses in which the jury declared it was deadlocked, and this court agreed. See State v. Houston, 328 S.W.3d 867, 869 (Tenn. Crim. App. 2010). Subsequently, in 2010, the defendant was tried for a second set of offenses, his convictions for which are the basis for this appeal. Counts 1 and 2 of the indictment charged him with offenses committed in 2004: aggravated assaults of Officer Adam Langley by use of a deadly weapon, to wit: an automobile. Count 3 charged him with felony reckless endangerment as to Sergeant Troy Wright; Count 4 charged him with felony evading arrest by Officer Adam Langley; Count 5 charged him with unlawful possession of a handgun while in commission of the felonies enumerated in Counts 1-4 and 6 of the indictment; and Count 6 charged him with vandalism between $500 and $1000. He was found not guilty by the jury as to Counts 1, 2, 5, and 6 and guilty of misdemeanor reckless endangerment in Count 3 and felony evading arrest in Count 4. He was sentenced to concurrent terms of eleven months and twenty-nine days and one year, respectively, sentences which had been completed because of his pretrial incarceration. We will review the testimony from the defendant's trial on these charges.

Officer Randy Childs testified that in August 2004, he was employed by the Kingston Police Department and assigned to the drug task force. On August 26, while he was off-duty, he spotted the defendant at the Kingston Post Office. Earlier in the day, he had learned that there was an outstanding arrest warrant for the defendant. He notified the sheriff's office of his seeing the defendant and, as he approached the post office, saw the defendant's truck go across a curb, with two sheriff's cars behind it, both cars utilizing their sirens and blue lights.

Troy Wright testified that he was employed as a sergeant with the Kingston Police Department. He said that on August 26, 2004, while on duty, he had learned that the defendant, who had an outstanding arrest warrant, was at the post office in Kingston. As he approached that location, he saw the defendant get into his vehicle, drive across a grassy median and a sidewalk and onto North Kentucky Street. Traffic was "fairly heavy" at the time, and Sergeant Wright activated his blue lights and siren. Sergeant Wright tried to pull his vehicle alongside that of the defendant, who then swerved toward Wright, trying to "run [him] over into oncoming traffic." The defendant's vehicle was going faster than the posted speed limit and came "out of the slow lane at [Sergeant Wright] into [his] lane of traffic and run [him] across the yellow line." The defendant's vehicle proceeded through red traffic lights without stopping. Deputy Langley passed the defendant's vehicle, and he saw the two vehicles "go together, come out, and then [saw] [the defendant's] truck go in the air." As he walked up to the vehicles, he saw that Deputy Langley's vehicle had been damaged and estimated that it was in excess of $500.

Adam Langley testified that, at the time of the trial, he was employed by Wackenhut, but, in 2004, he was with the Roane County Sheriff's Department. As he came to work on August 26, he learned that there was an arrest warrant outstanding for the defendant. He was instructed to go to the Kingston Post Office. Arriving at that location, Langley approached the defendant's truck, intending to talk with him. The defendant saw him, "put the vehicle in gear or cranked it up or whatever he was doing with his hands down here and he left real fast." Langley described the defendant's driving onto the roadway: "He goes up over the . . . sharp turn he made, he goes up and over the curb, through the grassy part that was surrounding the parking lot there, grassy curb and everything. He went up and over it and straight into four lanes of traffic."

Langley activated his blue lights and siren and radioed to other units that the defendant was "not stopping or [was] trying to run or whatever it is that I said at that time." He said that, although traffic was "very heavy," the defendant's truck "continued on through [red lights] as if they weren't there." Although the speed limit was 35, the defendant's speed was "45 miles an hour, 50 sometimes," as Langley drove behind him. Langley detailed actions taken by the defendant to prevent Langley's vehicle from passing him:

> When we are going – we are still in the city limits and we are passing the water heading south, passing the walking trail and the lake on the right, and we are heading south. And . . . if I moved to the left a little [the defendant] would move to the left, if I moved to the right he would move to the right. Again these are speeds anywhere from 45-50 miles an hour down through there.

> As we leave the city and we start up the hill it goes from two lanes to four. And at that point I attempted to pass [the defendant] on the right and when I cut back over in front of him to attempt to bring him to a stop he had maybe – when I pulled over in front of him he had three feet or four feet give or take. So when I did that, it was an attempt for two other patrol cars to come up beside him and one to the rear so you've got him boxed in and you can bring him to a halt that way – force him to come to a halt and pull him over.

As Langley's vehicle was in front, the defendant's truck "hit [it] once, maybe twice in the rear," Langley's vehicle "fishtailed," and the defendant then passed him. Langley explained what occurred as he tried to pass the defendant again:

> I tried to pass [the defendant] again, and . . . I got the nose of my car maybe three quarters way up his truck, he swerved to the right, made contact with my vehicle and everything happened so fast. His . . . right rear tire kind of went

over the front left quarter panel of my patrol car, he flipped and turned and I was pinned in this side of my car because of the contact his truck made to my patrol car. So I had to open the passenger door and get out that way. And as I got up to the vehicle [the defendant] was trying to get out of either the windshield or the side window of his [vehicle] that was turned over on its top. And . . . Officer Kerley was trying to hold him down and get him cuffed.

And when I got there I helped hold him down and Officer Kerley got him cuffed. And then at that point we had him in custody.

Langley said he was told that the damage to his vehicle exceeded $500.

The defendant's first witness was W.H. "Buddy" Hall, who had worked at the Oak Ridge plant for forty-two years. He described the accident between the vehicles of Langley and the defendant, saying, "[T]his guy went right around and hooked your bumper and turned you over right in the middle of the road," and "you come crawling out." He agreed that officers had drawn their guns as they approached the defendant.

Shawn Thompson testified that he had been employed by the Viskase Corporation for nineteen and a half years, working in maintenance. He came upon the accident involving the defendant's vehicle after it had occurred and saw that "three, maybe four" officers were beside it with their guns drawn.

Randall Allen Mershon testified that he had been employed at RiverBend Market "[o]n and off since '97." He was at work when he "[h]eard sirens, looked out the window, [and] saw [the defendant's] truck pass by with, [he believed] four patrol cars behind it." It "seemed" to him "like a patrol car come around [the defendant's] left side and at that point made contact with [the defendant's] left rear tire."

Betty Carol Robinette testified that she was employed by the Tennessee Valley Authority as a painter. She said that she had seen the defendant with "his flashers on and three police cars behind him." Later, she saw that his truck was upside down in the road and "thought he was dead." She saw that he was facedown, and a police officer "had his knee in the small of [the defendant's] back and one hand on his shoulder and gun pointed at him."

The defendant did not testify. As we have set out, he was convicted of reckless endangerment, a Class A misdemeanor, and evading arrest, a Class E felony.

**ANALYSIS**

-4-

In reviewing the issues to be decided in this appeal, we first will set out the complicated procedural path of the defendant's trial.

The judge who had presided over the first trial withdrew from the matter, and Special Judge David G. Hayes was appointed on July 6, 2009, to preside. Subsequently, on December 2, 2009, an order of the Tennessee Supreme Court was entered designating Senior Judge Jon Kerry Blackwood to hear the indictment in this matter. Attorney Randy Rogers, who had represented the defendant in his first trial and was representing him as to the indictment which is the subject of this appeal, filed a motion to withdraw from further representation of the defendant. On July 23, 2009, the trial court held a hearing on this motion, which was granted.[1]

At a subsequent hearing, the defendant advised the court that attorney Rogers still represented him in the matter, saying that he had "been paid in full of a large sum of money to be here." At a status hearing on January 21, 2010, as to whether the defendant had secured new counsel, the defendant said that the court had a "personal bias and a prejudice" against him and that the court was "under subpoena" and "there will have to be conflicts disclosed." The court subsequently appointed attorney Lindsey Lander to represent the defendant. On March 12, 2010, through appointed counsel, the defendant filed a motion to recuse Senior Judge Blackwood, saying that a subpoena had been issued for him in other litigation and he had shown a "bias" against the defendant in a preliminary hearing. Additionally, he asserted that attorney Rogers still represented him in the matter. The court denied the recusal motion on March 19, 2010, and, on March 31, 2010, granted the motion of appointed attorney Lindsey Lander to withdraw.

The trial was held on March 31-April 1, 2010, and, as we have set out, the defendant, proceeding pro se, was convicted of two counts of the indictment. He filed motions for new trial and for appointment of counsel on April 27. On April 30, 2010, he filed a "motion for arrest of judgment." Attorney Gerald Gulley, Jr. was appointed to represent the defendant on May 10, 2010, and on July 1, 2010, filed a motion to continue the sentencing hearing, and, in the alternative, that the trial judge recuse himself. On July 2, 2010, the court conducted a hearing on this motion, which was denied, the court explaining that it found "no objective or subjective reasons why this Court should recuse itself":

> There comes a time when the Court Judicial System simply has to stop being intimidated and simply to bring up to this Court that you are going to

---

[1]The trial court heard the motion to withdraw as to both cases in which the defendant's counsel then represented him and granted the motion but inadvertently neglected to include in the order the docket number of the present appeal.

subpoena this Court to be a material witness; I wasn't even in the Court room when this alleged spitting incident occurred so I don't see how in the world I could be – or this Court could be a material witness to any of that.

There comes a point in time when . . . this Court and this judicial system has to say once again, we are not going to be intimidated by threats of suits, by threats of subpoenas, by accusations. That by simply doing your judicial duties you are engaging in some conspiracy against that person's right.

Now, I've listened up here to [the defendant] and his brother talk about their constitutional rights, I've listened up here that they are American Citizens and they are entitled to this and that under the constitution. I want to tell you that if there is anybody in Roane County that has been protected, whose rights have been constitutionally secured it is these two brothers.

They have had the benefits of a fair trial, they've had the benefits of appeals, they've had the benefits of every right that . . . these Courts, and the Courts of Roane County can afford these defendants and instead of sitting down and kissing the floor and blessing this judicial system, they find nothing in the world to do but to attack as some paranoid fear of a conspiracy that they are going to unravel in Roane County.

That is it. The motion to continue and the motion to recuse [are] denied. The Court finds no objective or subjective reasons why this Court should recuse itself.

The court then proceeded to sentence the defendant, as we have set out.

On July 30, 2010, the defendant filed a pro se motion for judgment of acquittal and/or a motion for new trial, arguing that his convictions were obtained through "forgery, fraud, and conspiracy"; that he had been denied the assistance of counsel at trial; that the trial judge, prosecutor, and circuit court clerk had conflicts of interest; that a transcript of his preliminary hearing had been provided to the grand jury which indicted him; that neither a warrant nor capias had been served on him; and that the verdict of the jury was contrary to the weight of the evidence. On August 26, newly appointed counsel for the defendant filed a motion for new trial, asserting that (1) the evidence was insufficient to sustain the verdicts; (2) the court erred by allowing the attorney for the defendant to withdraw on the day of trial, "improperly forcing" the defendant to represent himself; (3) the court erred by failing to grant the defendant a continuance after his lawyer had been allowed to withdraw the

morning of the trial; (4) the court erred in failing to dismiss the indictment after the defendant had been denied a copy of the probable cause hearing and denied his right to a speedy trial; (5) the trial court erred in failing to recuse itself and to disqualify the special district attorney general; and (6) the trial court erred in failing to disqualify the jury pool because it had been selected by an assistant court clerk who had a clear potential for bias against the defendant. Subsequently, through the same appointed counsel, the defendant filed an amended motion for a new trial, adding the claim that the trial court had erred in denying the defendant's motion of acquittal at the end of the State's proof. By order entered on August 1, 2011, the trial court, without amplification, denied the motion for new trial.

The defendant then filed a pro se notice of appeal on August 26, 2011, alleging that "attorney Randy G. Rogers has refused to represent his client and defendant in criminal case no. 13226 and has stole[n] in excess of $60,000 to represent Rocky Joe Houston." Additionally, the notice of appeal stated that the defendant "is appealing [J]udge Jon Kerry Blackwood's order [denying] the defendant's motion for a new trial in criminal case no. 13226," which includes both of the five counts for which the defendant was tried, so this claim goes to both counts of which he was convicted.

In his appellate brief, the defendant sets out, as issues on appeal, (1) that this court "vacate and remand" Case No. 13226 to the trial court for a new trial; (2) appoint an "ethical, moral and competent" attorney to represent the defendant in the appeal; (3) require that attorney Randy G. Rogers admit or deny whether he has refunded to the defendant the $60,000 legal fee paid by the defendant to Rogers; (4) that named individuals, including members of the Court of Criminal Appeals, "request that a federal vital statistic audit be conducted into the record in criminal case no. 13226; (5) and investigate the trial judge for violating the Code of Judicial Conduct and the United States and Tennessee Constitutions. Additionally, the defendant filed a reply brief stating that, during the period from June 2006 through July 2007, he paid attorney Randy G. Rogers to represent him in Case No. 13226, and that on or about February 25, 2010, an order was entered in the Roane County Criminal Court allowing attorney Rogers to withdraw from this representation and that he has refused to return the funds paid to him by the defendant for that case, as well as this case. Additionally, the defendant states that he does not have the funds to retain an attorney in these matters and that he has not waived his right to counsel in them.

In our review of this appeal, we will consider, as issues, those raised by the defendant in his original and amended pro se appellate briefs.

## I. Sufficiency of the Evidence

In his motion for new trial, the defendant argued that the trial court erred in denying

the motion for new trial. Accordingly, we will review the evidence presented at the trial.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court. Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the trial in this matter, the defendant was found guilty of Counts 3 and 4, being sentenced, respectively, to eleven months, twenty-nine days and one year, the sentences to be served concurrently. The victim in Count 3, for which the defendant was convicted of reckless endangerment, was Sergeant Troy Wright. For conviction of this offense, the jury had to find that the defendant "recklessly engage[d] in conduct that place[d] or may [have] place[d] [Sergeant Wright] in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). As we have set out, Sergeant Wright testified, in part, that, as his vehicle was trying to pass the defendant, the defendant swerved his vehicle toward that of Wright, trying to force it into oncoming traffic. Taken in the light most favorable to the State, a reasonable jury could find that the defendant committed reckless endangerment with

his vehicle against Sergeant Wright. Likewise, as to Count 4, evading arrest, the jury had to determine that the defendant, after he had been signaled to stop, intentionally evaded arrest by a person he knew to be a law enforcement officer. See Tenn. Code Ann. § 39-16-603(b). We conclude that, based upon the testimony of the State's witnesses that after Sergeant Wright had activated his blue lights and siren in an attempt to stop the defendant's vehicle, the defendant tried to run Wright's vehicle into oncoming traffic to evade being arrested. From this testimony, we conclude that a reasonable jury could have concluded that the defendant, knowing that he was being pursued by law enforcement officers, chose to flee in his vehicle to avoid being arrested. Accordingly, we conclude that the evidence is sufficient to sustain the convictions for Counts 3 and 4.

## II. Appoint an "Ethical, Moral and Competent" Attorney to Represent the Defendant on Appeal

During the months since this matter was appealed, the defendant has requested on several occasions that this court appoint an attorney to represent him on appeal. We will review this request.

The record on appeal is confusing as to the defendant's dealings with attorneys, part of which we previously have set out. The record includes an affidavit of indigency, dated May 3, 2010, which is handwritten, making it difficult to read, acknowledging that the defendant has a residence, apparently with a mortgage of $60,000, which was "tied up"; a 1996 vehicle which is operable only upon occasion; and other real property, co-owned with relatives who would not agree to its being used to secure legal representation. The trial court accepted this affidavit and, on May 10, 2010, appointed counsel to represent the defendant "for the purposes of sentencing and appeal." On June 23, 2011, the court sent a letter to appointed counsel for the defendant, stating that his "indigency status may have changed since the last appointment of counsel" and directing that he file a new affidavit of indigency within five days. A copy of this order also was sent by "certified [mail] return receipt" to the defendant. Apparently, the defendant did not comply with this order, for, on July 11, 2011, the trial court entered another order, again requiring that the defendant file a current affidavit of indigency, this time by July 21, 2011, or appear in court that day to explain why he had not done so. According to an order of the court filed on July 29, 2011, the defendant neither filed a current affidavit of indigency nor appeared in court on July 21, 2011, to explain why his indigency status should not be revoked. Thus, appointed counsel was relieved from further representation of the defendant. On August 26, 2011, the defendant filed a pro se notice of appeal. The most recent affidavit of indigency of the defendant in the record on appeal is that filed in the trial court on May 3, 2010.

On December 16, 2011, while this matter was on appeal, the defendant filed with the

-9-

Court of Criminal Appeals a motion seeking several orders, one for the appointment of an "ethical, moral, competent and effective attorney" to represent him in his appeal. This court's order of January 18, 2012, concluded that the trial court had not abused its discretion in relieving appointed counsel from continued representation. In its order denying the motion, this court explained that the defendant's motion for appointment of counsel failed to include an affidavit of indigency. On April 13, 2012, the defendant filed another motion with the Court of Criminal Appeals, again seeking, among other things, that this court appoint an attorney to represent him on appeal. Again, this court declined to do so, explaining that he was not entitled to appointed counsel until he established that he was indigent. Additionally, this court explained that it had "no authority to enforce any private contractual agreements the [d]efendant may have made with an attorney to represent him in the proceedings below."

On July 20, 2012, this court granted the defendant's motion that this matter be set on the oral argument docket, and it was scheduled to be heard during the August 22, 2012 session of the Court of Criminal Appeals in Knoxville. On August 21, 2012, the defendant sent by facsimile transmission to the court clerk's office a pro se pleading advising the court that he would not appear the following day for the scheduled oral argument. Further, in this pleading, he advised the court that he had not waived his right to counsel. On August 29, 2012, the defendant filed a reply brief, repeating his earlier allegations that his former attorney, Randy G. Rogers, had refused to return a $75,000 legal fee, asking that the court order he do so and advising the court, again, that he had not waived his right to counsel.

As to appointment of counsel on appeal, this court has ruled both on January 18, 2012, and April 13, 2012, in response to identical requests, that appointment of counsel could not be considered unless he filed a current affidavit of indigency. Such an affidavit has not been filed by the defendant. Accordingly, we again rule that the defendant has not shown that he is indigent and, thus, entitled to appointed counsel.

### III. Require Defendant's Former Attorney to Disclose Whether He Returned Legal Fees to the Defendant

The defendant further argues that this court should require attorney Randy G. Rogers to "admit or deny" whether he has refunded to the defendant the $60,000 legal fee paid by the defendant to him. He also has asserted, in various pleadings, the related claims that the trial court erred in allowing appointed counsel to withdraw as the trial was to begin and, then, refusing to continue the trial so that he could obtain successor counsel. In reviewing this matter, we first will set out the dealings between the defendant and the attorneys who represented him.

The record on appeal includes a motion, filed on July 23, 2009, by attorney Randy G. Rogers, to withdraw from further representation of the defendant. In this motion, counsel recounted his efforts on behalf of the defendant in the trial of the first set of charges against the defendant and of substantial disagreements between the two of them. At a January 12, 2010 hearing on various motions, the court advised the defendant that attorney Rogers had informed the court that he was not representing the defendant in Case No. 13226, but only in the matter which was then under appeal. The defendant responded that he had paid attorney Rogers $150,000 for his representation and that, if Rogers were allowed to withdraw, the defendant was entitled to a return of $75,000. The defendant asked that the court conduct an evidentiary hearing to determine whether attorney Rogers represented him in the pending cases, which the trial court declined to do.

Subsequently, at a hearing on March 31, 2010, the trial court explained why the court was granting the motion of appointed counsel, Lindsey Lander, to withdraw from his representation of the defendant:

> But these litigations go back as far as the beginning of the other case which [the defendant] has been litigated up to the Court of Appeals when he said he was represented by Mr. Randy Rogers. From the beginning of the case, the preliminary hearing, three, four or five years ago. The record reflects that on that case [the defendant] didn't know whether Mr. Rogers at that initial incidence had a conflict with him.

> And since that time [the defendant] has engaged in a continuous pattern of filing lawsuits or trying to file lawsuits or threatening to file lawsuits against judges, lawyers, clerks.

> He has delayed the process of not only this case but of the other particular case by his constant threats of reporting lawyers, suing lawyers, suing judges. Mr. Rogers, who represented [the defendant] in the other case, was allowed to withdraw. We've been – at the conclusion of that case in which Judge Scott declared a mistrial which has recently been before the Court of [Criminal] Appeals; but subsequent to that Mr. Rogers was allowed to withdraw by Judge Hayes after a bitter and acrimonious argument in the court room, there is no doubt about that. And since that time, which has been about a year, [the defendant] has not retained any counsel to represent him and has maintained despite that bitter and acrimonious dispute between Mr. Rogers, that Mr. Rogers still represents him.

> When we first came to court here on this particular charge, he still

-11-

insisted that Mr. Rogers represented him. We called Mr. Rogers and he said he didn't. We have called Judge Hayes and . . . this Court has verified that it was Judge Hayes' intention to . . . allow Mr. Rogers to withdraw from that case and . . . no judge would allow him – Mr. Rogers to get close to this case because of the bitter dispute that [the defendant] had with him. Calling him a liar and reporting him, and calling him a coward and almost having to be restrained in court. And yet in this particular case, even after being informed that Mr. Rogers is not his attorney, he continued to insist that he was his attorney. The Court has reminded him that he is not.

The Court has appointed Mr. Landers to represent him. [The defendant] denies that he needs appointed counsel, will not fill out an affidavit of indigency. Even though all this period of time no retained lawyer has appeared to represent him. The Court has done everything it can do to protect his rights to get him a lawyer in this case.

And now in this present case he threatens to sue the lawyer, threatens to – according to the Board, take whatever actions he has and has subpoenaed him in a General Sessions case which the Court has ruled that you do not – Mr. Landers does not have a conflict and I know that [the defendant] probably disputes the fact that this Court has ruled that there is no conflict but he refuses in spite of what the Court orders in the case to abide by the order. His remedy of the Court is wrong about any conflicts in the Appell[ate] Court. It's not at this particular stage, yet he continues to want to litigate this issue.

He has demanded a speedy trial in this case, and we have given him a speedy trial.

Just recently he has filed motions to disqualify the Clerk after this Court on its own initiative removed Mrs. Randolph from this case because of the alleged spitting incident.

He asked for a new panel to be brought in, the Court has done that and now he challenges that new panel for some reason.

This man has manipulated, delayed, hindered, used every tactic that there could possibly be used in the last three or four years to delay every case he has before this Court.

And therefore this Court rules that he has waived his right to have a

-12-

lawyer represent him in this case and he will be representing himself.

The main question in this case is whether or not the justice system is going to be held hostage to a litigant that will use any method whatsoever to sue lawyers, judges, litigants, to file complaints against them, to continue to hinder for no good reason . . . the orderly administration of justice. And it is time that process came to an end.

[The defendant], you've got your lawyer and your lawyer is you, today.

You are excused Mr. Landers.

Additionally, the trial court explained why another lawyer was not being appointed to represent the defendant at his trial, which was to begin approximately one hour later:

If this Court gave you another lawyer and delayed this case anymore it would be more of the exact same as has occurred for the last three years. You would once again . . . disregard the advice of your lawyer. Once again, you would find a conflict with your lawyer. Once again, you would find reasons to delay, hinder or impede the process of this judicial proceeding[] by vague threats of conspiracy or allegations of conspiracy which have no foundation in fact.

Now, I'm going to tell you that jury selection will begin at 9:00.

Now, I'll ask Mr. Landers to do one last thing for you and that is to prepare a jury sheet so he can put the names of the jurors in the box. After that we will begin the jury selection process.

And [the defendant], your jury questions are directed to the qualifications of the jurors and not to any speech . . . that you would like to make to them. And I will be as indulgent as I possibly can with you. But if I tell you to move or that's not a proper statement or a proper question, you will abide by that order.

The decision to allow counsel to withdraw lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. See State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993); State v. Gilmore, 823 S.W.2d 566, 569 (Tenn. Crim. App. 1991). In this matter, the trial court found, and recited for the record, the defendant's antagonistic relations with the several counsel who had represented him and of the resulting delays in

-13-

resolution of the pending indictments. The record supports the trial court's determination to allow counsel to withdraw as to the matters set to go to trial. See State v. Carruthers, 35 S.W.3d 516, 549 (Tenn. 2000) ("[E]ven '[t]hough a defendant has a right to select his own counsel if he acts expeditiously to do so . . . he may not use this right to play a 'cat and mouse' game with the court[.]'") (quoting State v. Chadwick, 224 Tenn. 75, 79, 450 S.W.2d 568, 570 (1970)).

As to the defendant's claims against attorney Rogers, we are unaware of any authority whereby we may become involved, in the direct appeal of a criminal conviction, in the financial dealings between the defendant and a lawyer. Further in this regard, we have no authority to compel counsel to disclose fee arrangements between him and the defendant. As to the defendant's claim that his trial should have been continued so he could obtain successor counsel, the record supports the trial court's findings as to the acrimonious dealings between the defendant on one hand and the court and his various counsel on the other. While it is regrettable that the defendant proceeded without counsel, the record fully supports the determination of the trial court that he do so. This issue is without merit.

## IV. Preparation of a "Vital Statistic Audit"

The defendant argues on appeal that this court should order the preparation of a "vital statistic audit" in this matter. It is not clear what the defendant believes the benefit of such a document would be. However, this court is without the authority to order the preparation of such a document and, accordingly, this matter is without merit.

## V. Investigate Trial Judge for Violating the Code of Judicial Conduct and United States and Tennessee Constitutions

The defendant has not provided an explanation of the alleged violations by the trial judge he wishes to have investigated or suggested how an appellate court could provide this relief. We conclude that we cannot do so and, therefore, this request is denied.

## CONCLUSION

Based upon the following authorities and reasoning, the judgments of the trial court are affirmed.

PER CURIAM